

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 27, 2025

**BY ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    United States v. Qingzhou Wang and Yiyi Chen, S1 23 Cr. 302 (PGG)

Dear Judge Gardephe:

      The Government writes in response to defendant Qingzhou Wang's motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29,[1] and, in the alternative, for an entrapment charge to the jury.[2] (Dkt. 127). For the following reasons, the motions should be denied.

## Venue

      Wang argues that all five counts of the Indictment should be dismissed to lack of venue. (Mot. at 1–3). The Government bears the burden of proving venue by a preponderance of the evidence. *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990).[3] At trial, the Government established proof of venue in two ways.

      First, as to the three conspiracy counts (Counts One, Two, and Five), venue is established by the physical presence of one of the DEA confidential sources in Manhattan who participated in the May 10, 2023 video call with the defendants. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018) ("A telephone call placed by someone within the Southern District of New York — even a person acting at the government's direction — to a co-conspirator outside the Southern District can render venue proper as to the out-of-district co-conspirator so long as that co-conspirator uses the call to further the conspiracy."). The Government offered evidence that

---

[1] Wang frames his venue argument as a motion to dismiss pursuant to Rule 18. (Mot. at 1). A motion to dismiss for improper venue ordinarily must be filed before trial. Fed. R. Crim. P. 12(b)(3)(A)(i). The Government therefore analyzes Wang's venue argument as part of his Rule 29 motion.

[2] Defendant Yiyi Chen orally joined Wang's motions and advised that she would submit a written submission. (Tr. 1118). Chen has not yet filed a written submission.

[3] Unless otherwise specified, all internal quotation marks, citations, and prior alterations are omitted.

the confidential source known as "Guillermo" — who participated in the May 10, 2023 video call — was in Manhattan at the time of the call, and that the participants on the call were told he was in Manhattan. (Tr. 587 ("Q: Mr. Rodriguez, directing your attention to page 2 of 504B-T, you reference that Guillermo, he's just there in Manhattan checking on the lab. What are you referring to there? A: I was letting them know that Guillermo, the other confidential source at that time, was playing the role as an investor. He was already in Manhattan checking on the lab. Q: And where was Guillermo, in fact, during that call? A: During that call, he was in Manhattan.")). Because on the call, the defendants discussed the ongoing scheme to ship precursors chemicals into the United States for the purpose of manufacturing fentanyl, as well as payment for the chemicals, this call was in furtherance of the three charged conspiracies. (Tr. 577–83; *see also* GX 504A; GX 504B; GX 504A-T; GX 504B-T). And because the defendants understood from the March 23, 2023 Bangkok meeting that their buyers were building a fentanyl laboratory in New York, (Tr. 412–13; GX 502B; GX 502B-T) — and indeed had drawn up an invoice for pickup at a warehouse in New York, (GX 402 at 10) — venue in this District was reasonably foreseeable to them. The May 10, 2023 video call therefore establishes venue as to Counts One, Two and Five.

Second, as to the substantive importation counts (Counts Three and Four), and as an additional basis for venue as to the three conspiracy counts (Counts One, Two, and Five), venue is established by the movement of the January 2023 shipment through the territorial waters of the Southern District of New York. *See United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) ("Thus, as to a charge of importation, venue may properly be laid 'in any district from, through, or into which . . . such imported object . . . moves.'" (quoting 18 U.S.C. § 3237)). The FedEx shipping label on the January 2023 shipment bore an origin address in La Mirada, California, and a destination address in Manhattan, New York. (GX 102). The parties stipulated that the package was retrieved by the DEA, before final delivery, from a FedEx facility located in Brooklyn, New York. (GX 1004). Elvin Fermin, a FedEx employee at that Brooklyn location, testified that: (1) the FedEx shipping label for the January 2023 was for a SmartPost package, (Tr. 379); (2) SmartPost packages travel from the West Coast to the New York City metropolitan area by air cargo, rail car, or ground transportation, (Tr. 349); (3) SmartPost packages traveling by any of these methods would be transported to a New Jersey hub for sorting, (Tr. 349, 358, 380);[4] and (4) SmartPost packages would then travel by tractor-trailer over either the George Washington Bridge or the Verrazano bridge to arrive at the Brooklyn FedEx facility, (Tr. 362). Although Mr. Fermin was unable to locate specific tracking information for the January 2023 shipment, due to FedEx's data retention policy of 40 days to one year, (Tr. 348), that does not render his testimony speculative. Mr. Fermin's testimony about the typical routing of SmartPost packages from the West Coast to his facility in Brooklyn — where the January 2023 SmartPost package was retrieved in this case — is sufficient for a reasonable juror to determine, by a preponderance of the evidence,

---

[4] Wang points out that FedEx Express packages can move from the JFK airport to Brooklyn without being sent to a New Jersey hub. (Mot. at 2). Mr. Fermin testified that the January 2023 package was not a FedEx Express package because, among other reasons, it bore the letter "S" (for SmartPost) rather than "E" (for Express). (Tr. 379; *see also* Tr. 346 (explaining at that the additional USPS tracking number also indicated the package was shipped by SmartPost)).

U.S. v. Qingzhou Wang and Yiyi Chen, S1 23 Cr. 302 (PGG)                              Page 3
Hon. Paul G. Gardephe
January 27, 2025

that the January 2023 shipment traveled over the territorial waters of the Southern District of New York.

The Rule 29 motion as to venue should therefore be denied.

### Ortho-methylfentanyl Conspiracy

Wang argues that the ortho-methylfentanyl object of Count One should be dismissed because "there simply is no evidence of any agreement to manufacture ortho-methylfentanyl." (Mot. at 4). "In considering a [Rule 29] motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. All permissible inferences must be drawn in the government's favor [and] . . . the court must be careful to avoid usurping the role of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

The evidence at trial established that the substances ordered for the May 2023 shipment were 1-boc-4-AP, propionyl chloride, and (2-bromoethyl)benzene. (GX 402 at 10; Tr. 808). The substances actually delivered, however, were ortho-methyl-N-boc-4-AP (instead of 1-boc-4-AP), propionyl chloride, and (2-bromoethyl)benzene.[5] Dr. Herdman, an PhD chemist specializing in drug design and synthesis, testified that these three delivered substances can be used together to create ortho-methylfentanyl. (Tr. 821). In fact, Dr. Herdman testified that ortho-methyl-N-boc-4-AP is used to synthesize ortho-methylfentanyl in exactly the same way that 1-boc-4-AP is used to synthesize fentanyl. (Tr. 822). Wang's chemist, Ms. Heather Harris, agreed that ortho-methyl-N-boc-4-AP is a precursor of ortho-methylfentanyl. (Tr. 1104).

The jury can reasonably infer that when the defendants shipped ortho-methyl-N-boc-4-AP, propionyl chloride, and (2-bromoethyl)benzene, they intended to manufacture the controlled substance — ortho-methylfentanyl — that those chemicals combine to make. *See United States v. Santiago-Ortiz*, No. 17 Cr. 149 n.28 (LAK), 2018 WL 4054859, at *3 (S.D.N.Y. Aug. 23, 2018) ("A jury may infer that one intends the natural and probable consequences of one's actions."), *aff'd*, 797 F. App'x 34 (2d Cir. 2019). This inference is buttressed by the evidence that: (1) the defendants knew that the precursors ordered were to make fentanyl, (*see, e.g.*, Tr. 412–13; GX 502B; GX 502B-T); (2) the co-conspirator known as "Anita" represented after circulating the order invoice that the precursor 1-boc-4-AP was out of stock, (GX 401 at 58–59; GX 402 at 12); (3) the defendants substituted ortho-methyl-N-boc-4-AP for the 1-boc-4-AP in the actual shipment, as reflected in the lab analysis; (4) if used in the exact same manner that 1-boc-4-AP would have been used to synthesize fentanyl, the ortho-methyl-N-boc-4-AP in the shipment would have made ortho-

---

[5] The testing chemist, Fracia Martinez, testified that the substances in the shipment were tert-butyl 4-((2-methylphenyl)amino)piperidine-1-carboxylate, 2-phenethyl bromide, and propionyl chloride. (Tr. 771, 777). Dr. Christine Herdman explained that the first substance is also known as ortho-methyl-N-boc-4-AP, and the second substance is also known as (2-bromoethyl)benzene. (Tr. 809, 819).

U.S. v. Qingzhou Wang and Yiyi Chen, S1 23 Cr. 302 (PGG)                                    Page 4
Hon. Paul G. Gardephe
January 27, 2025

methylfentanyl, as Dr. Herdman explained; and (5) the defendants expressed that they could make chemical modifications to their products in responses to regulatory changes.[6]

Because a reasonable juror could find beyond a reasonable doubt that the defendants conspired to manufacture and distribute ortho-methylfentanyl, the Rule 29 motion as to the ortho-methylfentanyl object of Count One should be denied.

### January 2023 Importation of 1-boc-4-AP and Methylamine

Wang argues that Counts Three and Four, which charge the substantive importation of 1-boc-4-AP and methylamine in the January 2023 shipment, should be dismissed as to him because "there was no testimony as to Mr. Wang's involvement in the shipment of chemicals received on January 18, 2023." (Mot. at 4).

The evidence at trial established that Anita, who organized the January 2023 shipment, repeatedly referenced the involvement of her boss in approving that order. (*See* GX 401 at 15 (Anita: "And how much did your friend pay? I need to check with my boss, otherwise my boss will not arrange the delivery"), 16 (Anita: "My boss said that the money has been received. . . . I will apply for delivery to my boss."); *see also* Tr. 167–70). Anita later identified her "boss" as "Bruce Wang," (Tr. 168), and confirmed that her boss, "Bruce Wang," would be attending the meeting in Bangkok. (Tr. 214; GX 401 at 41–43). A reasonable jury could infer from this evidence that Wang approved the January 2023 shipment of 1-boc-4-AP and methylamine to the United States, particularly given the other evidence of his role as the leader of the precursor importation conspiracy — including his own statements. (*See, e.g.*, GX 806-T (Wang: "@Yang Er [He] can have the conversation; no problem. But make it clear to him that both Director Xia and I are the bosses, Director Xia is not responsible for any actual work, and Director Wang has the final say over here.").

Because a reasonable juror could find beyond a reasonable doubt that Wang participated in the January 2023 importation of 1-boc-4-AP and methylamine into the United States, the Rule 29 motion as to Counts Three and Four should be denied.

### The Methylamine Reporting Requirement

Wang argues that Count Four, which charges the substantive importation of methylamine into the United States, should also be dismissed as to him because the lab-determined quantity of

---

[6] For example, at the June 2023 meeting in Fiji, Chen explained: "So product always be — we should be innovate for new product, because the policy always, always update. . . . Mhm, and we also we have our own technical to, mm, to create something new for uh avoid uh, the new policy. . . . Always update our, our route." (GX 505A; GX 505A-T). Similarly, at the March 2023 meeting in Bangkok, Wang explained that the conspirators' products had "evolved" and that "this product is that product's . . . parent," apparently referring to a precursor. (GX 502O-T; *see also* Tr. 530).

approximately 900 grams of methylamine "does not trigger any of the reporting requirements of List I chemicals under 21 C.F.R. 1313." (Mot. at 5).

Wang misunderstands the regulatory framework for listed chemicals. As alleged in the Indictment, "[a] chemical manufacturing company may legally import regulated chemicals into the United States, including, for example, 1-boc-4-AP, if it does so in coordination with a U.S. company that is registered with the DEA to import such chemicals. Likewise, any properly registered entity in the United States must report to the DEA the source of the regulated chemicals it imports." (Dkt. 79 ¶ 11 n.5). These are two separate requirements. The first requirement is registration: Pursuant to 21 C.F.R. § 1309.21(a)(1), unless exempted by law, "[e]very person who . . . imports or proposes to . . . import a List I chemical" must "annually obtain a registration specific to the List I chemicals to be handled." The second requirement is reporting: Pursuant to 21 C.F.R. § 1313.12(a), "[e]ach regulated person who seeks to import a listed chemical that meets or exceeds the threshold quantities identified in § 1310.04(f) of this chapter . . . must notify the Administration of the intended import."

The reporting threshold for methylamine is one kilogram. 21 C.F.R. § 1310.04(f)(1)(i). That the quantity of methylamine imported in January 2023 was approximately 893.6 grams, (Tr. 327), may exempt it from the reporting requirement, but not the registration requirement. Accordingly, the Government may prove that Wang knew or intended that the listed chemical methylamine would be unlawfully imported into the United States, (*see* draft charge), by showing that he knew or believed it would be imported by someone who was not lawfully registered to receive it.

At trial, both DEA confidential sources testified that they posed as drug traffickers. (Tr. 146, 394). Both also testified that they never claimed that they were legally authorized to import chemicals into the United States, and that neither Wang nor Chen nor Anita ever asked. (Tr. 260, 611–612). Moreover, at the Bangkok meeting, the defendants discussed evading customs in the United States. (Tr. 500–01; GX 502M; GX 502M-T (Wang: "The security to the US is still top notch; perhaps 1 out of 1000 orders might be detained." Chen: ". . . The successful rate: maybe 1,000 times, the customs will have one time problem.")). Similarly, at the Fiji meeting, the defendants discussed the risk of their shipments being seized by law enforcement. (Tr. 605–06; GX 505C; GX 505C-T (Wang: "[W]hat if the goods were inspected in the United States?" . . . Chen: "If our products blocked by the police . . . you have any, uh . . . " Gil: "Ways to get out?" Chen: "Yeah, yeah.")). These statements only make sense if the defendants knew they were involved in illicit activity. In sum, there is ample proof that Wang knew and intended that the methylamine he sent would be unlawfully imported into the United States.

Because a reasonable juror could find beyond a reasonable doubt that Wang knew or intended that the methylamine in the January 2023 shipment would be unlawfully imported into the United States, the Rule 29 motion as to Count Four should be denied.

## The Entrapment Instruction

Neither Wang nor Chen can meet their burden to show that he or she was induced to commit the charged crimes, and therefore, neither defendant can establish an entrapment defense.

U.S. v. Qingzhou Wang and Yiyi Chen, S1 23 Cr. 302 (PGG)                                Page 6
Hon. Paul G. Gardephe
January 27, 2025

For the same reasons the Court granted the Government's motion *in limine* to preclude defendants from offering or arguing such a defense at trial, Wang's renewed request for an entrapment charge is meritless. (Transcript of January 8, 2025 Final Pretrial Conference ("FPTC Tr.") at 5–8). Indeed, as described below, the evidence at trial only further supports the Court's prior determination that an entrapment charge is unwarranted here.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). A defendant hoping to assert the entrapment defense "has the burden to produce some credible evidence . . . that the government induced him to commit the crime." *United States v. Cabrera*, 13 F.4th 140, 147 (2d Cir. 2021) (internal quotation marks omitted); *United States v. Kopstein*, 759 F.3d 168, 173 (2d Cir. 2014) ("The defendant bears the burden of presenting credible evidence of government inducement."). "While stealth and strategy are necessary weapons in the arsenal of the police officer, and artifice and stratagem may be employed to catch those engaged in criminal enterprises, that the government employed either does not necessarily mean that it was the government that initiated the crime." *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006) (internal citations and quotation marks omitted), *abrogated on other grounds by Cabrera*, 13 F.4th 140 (2d Cir. 2021). If a defendant establishes inducement, "[t]he burden then shifts to the government to show that the defendant was predisposed to commit the crime beyond a reasonable doubt." *United States v. Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007).

"A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (internal quotation marks omitted). The Government may show that a defendant was predisposed to commit the crime charged by demonstrating: "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *Id.* (quoting *United States v. Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)); *see also United States v. Al-Moayad*, 545 F.3d 139, 154 (2d Cir. 2008) (same).

*First*, contrary to what Wang argues, (Mot. at 6–10), the evidence at trial firmly established that neither Wang nor Chen was induced by the DEA confidential sources. The defendants and their co-conspirators advertised their precursor chemical business, Amarvel Biotech, long before the first confidential source (Jose) began negotiating with Anita in November 2022. Specifically, Chen registered Amarvel Biotech's domain name in April 2022, (GX 301A), and in August 2022 received multiple notifications from Google regarding impermissible advertisements that implicated fentanyl, (GX 810–813).[7] Chen testified that, at the time she received the Google notifications, she understood that it was due to certain of the webpages on Amarvel Biotech's

---

[7] For example, on or about August 4, 2022, Chen received an email from "Google Ads Policy [M]anager" indicating "Disapproved," and "Certificate required: Prescription Opioid Painkillers," and "Destination: FENTANYL." (GX 810).

websites posting content related to fentanyl. (Tr. at 1180–81). Indeed, multiple of the Amarvel Biotech-branded webpages on sites registered to Chen explicitly advertised precursor chemicals for the manufacture of fentanyl, including 1-boc-4-AP, one of the fentanyl precursors that the confidential sources ordered from the conspirators in this case. (*See* GX 208 (advertising CAS No. 125541-22-2 (1-boc-4-AP) for "use[] as the intermediate in the preparation of Fentanyl derivatives"); 212 (same); 215 (same); 218 (same); *see also* GX 204 (advertising CAS No. 125541-22-2 (1-boc-4-AP) for use as "intermediate in the preparation of F derivatives")).

*Second*, the evidence at trial established that the first conspirator to engage with the DEA was not Chen or Wang, but rather Anita. (Tr. 147; GX 401 at 3). It was in the course of those initial dealings that Anita told Jose that Amarvel Biotech could ship precursor chemicals directly to New York and confirmed that the chemicals could be used to make fentanyl. (GX 401 at 3–4, 6, 10–11)). During the negotiations for this initial purchase of fentanyl precursors, and for subsequent purchases discussed into February 2023, Anita repeatedly referenced the involvement of her "boss," whom she identified as Wang. (GX 401 at 13, 15, 16, 33, 34, 35, 37–38, 40–42). And it was Anita who ultimately introduced the confidential sources to Wang and Chen in advance of their meeting with Gil in Bangkok. Indeed, before arriving in Bangkok, Anita had already coordinated separately with Wang and Chen as to their travel to and meeting in Bangkok for the purposes of negotiating another precursors chemical purchase from the Confidential Sources. The internal chat messages amongst Wang, Chen, and Anita, as introduced at trial, make this clear. (*See generally* GX 806-T, 807-T). In one internal group text message chain started by Wang on March 17, 2023, Anita provided the relevant information for "the Mexican client" (Jose) and Jose's boss (Gil), whom she intended Wang and Chen to meet, including their names and itinerary. (GX 806-T at 2, 12, 13, 14, 17, 19–21, 23, 31). Anita separately forwarded to Chen numerous chat messages with Jose, along with additional information on Gil. (GX 807-T). As the Court held at the final pretrial conference, Anita's introduction of the confidential sources to Wang and Chen precludes any claim of inducement by Wang or Chen because a defendant cannot claim entrapment where they were, as here, introduced to confidential sources or undercover agents through a co-conspirator. (FPTC Tr. 8 ("Given this chain of events, no entrapment defense is available to Wang and Chen. Even if [Anita] was induced by the government to commit the crime — and, again, there is no evidence that such is the case — 'where a government agent induces a middleman to commit a crime, and the middleman . . . takes it upon himself to induce another person to participate in the crime, the latter party state's attorney is not entitled to a derivative entrapment charge.'" (quoting *United States v. Al-Moayad*, 545 F.3d 129, 158 n.15 (2d Cir. 2008))); *see also United States v. Williams*, 453 F. App'x 74, 79 n.1 (2d Cir. 2011) (same). In other words, even assuming Anita, as the effective "middle" person, had in fact been induced by Jose (which she was not), Anita's introduction of Wang and Chen defeats their claim of inducement as a matter of law, as the Court has already held.

The Court should therefore deny the request for an entrapment instruction.

*U.S. v. Qingzhou Wang and Yiyi Chen*, S1 23 Cr. 302 (PGG)                                          Page 8
Hon. Paul G. Gardephe
January 27, 2025

## Conclusion

      For the foregoing reasons, the motions for judgment of acquittal and for an entrapment charge should be denied.

                                                         Respectfully submitted,

                                                         DANIELLE R. SASSOON
                                                         United States Attorney

                                        By:  /s/
                                              Alexander Li / Kevin Sullivan
                                              Assistant United States Attorneys
                                              (212) 637-2265 / -1587

cc:      All counsel of record (*by ECF*)