UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

QINGZHOU WANG, and YIYI CHEN,

Defendants.

**MEMORANDUM
OPINION & ORDER**

(S1) 23 Cr. 302 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Indictment (S1) 23 Cr. 302 charges Defendants Qingzhou Wang and Yiyi Chen

with conspiracy to manufacture, distribute, and possess with intent to manufacture and distribute

fentanyl (Count One); conspiracy to manufacture and distribute a listed chemical – 1-boc-4-AP, a

fentanyl precursor chemical – knowing and having reasonable cause to believe that it would be

imported into the United States and used to manufacture fentanyl (Count Two); and conspiracy

to commit money laundering (Count Five). (Indictment (Dkt. No. 79))[1] Wang is also charged

with manufacturing and distributing 1-boc-4-AP, knowing and having reasonable cause to believe

that it would be imported into the United States and used to manufacture fentanyl (Count Three),

and with manufacturing and distributing a listed chemical – methylamine, a methamphetamine

precursor chemical – knowing and having reasonable cause to believe that it would be imported

into the United States (Count Four). (Id.)

---

[1] Citations to page numbers of docketed material correspond to the pagination generated by this
District's Electronic Case Files ("ECF") system. Citations to the trial transcript correspond to
the pagination generated by the court reporter. Unless otherwise noted, references to "Tr." are to
the trial transcript.

Wang and Chen proceeded to trial on January 13, 2025.  After a two-and-a-half-week trial, a jury acquitted both Defendants on Count One; convicted Wang on Counts Two, Three, Four and Five; and convicted Chen on Counts Two and Five.  (Verdict (Dkt. No. 134))[2]

Wang has moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on Count Four – importation of methylamine.  (Wang Mot. (Dkt. No. 135))  Wang argues that the Government did not offer evidence sufficient to demonstrate that he was involved in the shipment of methylamine to the United States, that he "knew the chemical was methylamine, or that he knew that methylamine is controlled or regulated by the United States drug laws."  (Id. at 1-2)

Chen has moved under Rule 29 for a judgment of acquittal on Count Two (conspiracy to import 1-boc-4-AP) and Count Five (conspiracy to commit money laundering), or alternatively for a new trial under Rule 33.  (Chen Mot. (Dkt. No. 136); Am. Chen Br. (Dkt. No. 141))  Chen argues that the evidence is insufficient to demonstrate the object of either conspiracy, and that she is entitled to a new trial because certain evidence was erroneously admitted as against her.  (Am. Chen Br. (Dkt. 141) at 10-14)

For the reasons stated below, Wang and Chen's motions will be denied.

---

[2]  As to Count Two – conspiracy to import 1-boc-4-AP – the jury found that both Defendants knew or had reasonable cause to believe that this chemical would be used to manufacture fentanyl.  (Verdict (Dkt. No. 134) at 3)  As to Count Three – importation of 1-boc-4-AP – the jury found that Wang knew or had reasonable cause to believe that the 1-boc-4-AP would be used to manufacture fentanyl.  (Id. at 4)

## BACKGROUND

I.    **THE EVIDENCE AT TRIAL**

A.    **The Government's Evidence**

The Government called twelve witnesses at trial and introduced 230 exhibits into evidence.  The Government's proof included, <u>inter alia</u>, the testimony of two confidential sources working for the Drug Enforcement Agency ("DEA") who posed as members of a Mexican drug cartel; video and audio recordings of the Defendants; WhatsApp messages between the confidential sources and the Defendants; the chemicals that the Defendants had arranged to transport to the United States from China; and expert testimony from three DEA chemists concerning the nature and uses of the chemicals that the Defendants had provided.

1.    **The Amarvel Biotech Website**

Amarvel Biotech is a chemical company located in Hubei Province, China.  (Trial Transcript ("Tr.") 192)  In April and May 2022, Defendant Chen – an Amarvel Biotech marketing employee – registered six web domains[3] operated by Amarvel Biotech, including amarvelbio.com, its primary website.  (<u>See</u> GX 301A to 301G)  Each of these websites advertised

---

[3]  A web domain is a unique name that is used to access a particular website.  (Tr. 915-16)

for sale, inter alia, two fentanyl precursor[4] chemicals:  1-boc-4-AP[5] and 1-boc-4-piperidone.[6]

(See GX 203-205, 207-208, 211-212, 214-215, 217-220)  1-boc-4-AP is a "List I" chemical that is a

controlled substance pursuant to DEA regulations.  (See 21 C.F.R. § 1310.02(a)(39); 87 Fed. Reg.

67550-01 (Nov. 9, 2022))  Some of the Amarvel Biotech website advertisements for 1-boc-4-AP

state that this chemical substance is an "[i]ntermediate in the preparation of Fentanyl derivatives"

(See GX 208, 212, 215, 218), while others replace the word "Fentanyl" with the letter "F."  (GX

204 (describing 1-boc-4-piperidone as an "intermediate in the preparation of F derivatives"))

Several of the Amarvel Biotech websites offer methylamine,[7] which is a precursor chemical for

methamphetamine.  (GX 202, 209, 213)

The Amarvel Biotech websites also inform prospective customers that the

company will use special packaging to disguise the nature of the chemicals it sells.  For example,

a promotional video on amarvelbio.com shows packaging designed to convey that an Amarvel

Biotech shipment contains engine oil, dog food, beeswax, or nuts:

---

[4] "A precursor chemical is a chemical that is used to make a final product."  (Tr. 797)
[5] As DEA chemist Dr. Christine Herdman testified, chemists sometimes use different names in referring to the same chemical substance.  The different shorthand names address different components that make up the substance.  (Tr. 806)  For example, 1-boc-4-AP may be referred to as
- N-boc-4-AP;
- 1-N-boc-4(phenylamino)piperidine;
- tert-butyl 4-(phenylamino)piperidine-1-carboxylate; and
- 4-anilino-1-boc-piperidine.
(Tr. 808)  Chemists also sometimes refer to chemical substances by their Chemical Abstract Service ("CAS") number, which is a unique identifying number for each substance.  (Tr. 796)  The CAS number for 1-boc-4-AP is 125541-22-2.  (Tr. 804)
[6] Dr. Herdman testified that 1-boc-4-piperidone is also referred to as
- N-boc-4-piperidone;
- 1-N-boc-4-(phenylamino)piperidine; and
- N-(tert-butoxycarbonyl)-4-piperidone.
(Tr. 808)  The CAS number for this substance is 79099-07-3.  (Id.)
[7] The CAS number for methylamine is 74-89-5.  (Tr. 800)



(GX 206A; see also GX 208-212, 217-220 (Amarvel Biotech website pages depicting and describing deceptive packaging and shipping procedures))

   The Government also offered images, videos, and text found on Chen's laptop that matched content that Amarvel Biotech published online.  (See, e.g., GX 711 (image of "Nature's Nuts" packaging found on Chen's laptop); GX 714 (video of 1-boc-4-piperidone powder found on Chen's laptop); GX 719 (image of 1-boc-4-piperidone powder found on Chen's laptop); GX 745 (text file containing a product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives")))

   In August 2022, Chen received a series of emails from Google, informing her that certain Amarvel Biotech advertisements had been taken down by Google because they contained prohibited terms, including the word "Fentanyl."  (See GX 810-813)

2.       **November 2022 – January 2023:  The First Shipment**

In November 2022, "Jose" – a DEA confidential source posing as a Mexican drug trafficker – contacted Amarvel Biotech using WhatsApp.  (Tr. 148-49)  Er Yang, a/k/a "Anita," responded on behalf of the company.  (Tr. 145-49)  Jose and Yang discussed certain chemicals that Jose said that he wanted to purchase, including 1-boc-4-AP and 1-boc-4-piperidone.  (Tr. 153, 154)  On November 17, 2022, while negotiating the purchase with Yang, Jose messaged Yang: "You know I making fentanyl" and "Is not safe."  Yang responded, "I know."  (GX 401 at 5)  Yang told Jose "not [to] worry about payment issues being traced, as most of our customers use Bitcoin and Western Union for payment and are always safe."  (Id. at 9)  Jose asked Yang if Amarvel Biotech had customers in Mexico, and Yang stated that the company had "[a]bout 7-8" in Mexico, as well as other customers in the United States and Canada.  (Id. at 10)

On December 5, 2022, Jose told Yang that he wanted to purchase one kilogram each of 1-boc-4-AP, 1-boc-4-piperidone, and methylamine.  (GX 401 at 11; Tr. 148-49, 165-67)  Jose told Yang that the packages containing these chemicals should be addressed to "Mark Anderson, 14 Murray St. # 260, New York, NY 10007."  (GX 401 at 11)  The next day, Yang told Jose the price for each chemical:  $769 for a kilogram of 1-boc-4-AP; $240 for a kilogram of 1-boc-4-piperidone; and $180 for a kilogram of methylamine.  (GX 401 at 13)  Yang also told Jose that she would ask her "boss for a more favorable price when the number of our cooperation increases."  (Id.)

Yang and Jose also agreed that Jose would pay for the chemicals using USDT, a cryptocurrency.[8]  On December 8, 2022, Yang sent Jose the address for a cryptocurrency wallet to which Jose was to send the $1180 in USDT.  (Id. at 14)  After Jose told Yang that he had made

---

[8]  USDT's value is pegged to the U.S. dollar.  (Tr. 166)

the transfer, Yang said that she would "confirm with [her] boss and apply for shipment as soon as possible after receiving it." (<u>Id.</u> at 15)  Yang later stated that her "boss said that the money has been received." (<u>Id.</u> at 16)  When coordinating the details of the shipment, Yang assured Jose to "please rest assured, this delivery will be very safe." (<u>Id.</u> at 17)

On December 21, 2022, Yang asked Jose whether he had bought the chemicals for his "own use" or intended to sell it "to [his] customers." (<u>Id.</u> at 20)  Jose responded that he would use the chemicals "to make fentanyl." (<u>Id.</u>)  Jose explained that "[t]hat's why [it] is important to know if this [is] the right product.  So I can buy [a] big amount." (<u>Id.</u>)  Yang responded, "I see.  In Mexico, a lot of people do buy piperidine for this." (<u>Id.</u>)  Jose responded, "Yes I know.  But main market is the USA." (<u>Id.</u> at 21)

On December 26, 2022, Yang sent Jose a copy of the FedEx label for the shipment. (<u>Id.</u> at 22-23)  On January 18, 2023, DEA agents retrieved a package bearing the same FedEx label from a FedEx facility in Brooklyn, New York. (GX 1004; Tr. 309-10)  The package contained three individually sealed bags. (GX 102-104 (photographs of the package and the three bags inside))  DEA forensic chemist Matthew Sider later examined the contents of the package and determined that it contained approximately one kilogram of 1-boc-4-AP, approximately one kilogram of 1-boc-4-piperidone, and approximately 894 grams of methylamine. (Tr. 322, 324, 327)  After the package had arrived, Jose told Yang, "We made some fentanyl and others.  We are going to give to our customers but all look very good." (GX 401 at 32)

### 3.    <u>March 2023:  The Bangkok Meeting</u>

Even before the January 2023 shipment arrived in New York, Jose and Yang began discussing a face-to-face meeting. (<u>See, e.g.,</u> GX 401 at 26 (Yang writing, "My boss agrees to go to Thailand or Malaysia to talk with you, but we need [you] to pay [a] 10% deposit in advance.  In this way, our cooperation can be confirmed and the price increase after our

holiday can be avoided.  You will be our guest.")) On February 13, 2023, Jose proposed sending $5,000 as a deposit in advance of a meeting in Bangkok.  Yang responded that she needed "to call [her] boss to confirm."  Yang later said that her "boss has agreed to our proposal" and payment via USDT.  (Id. at 35)  Yang also told Jose that her "boss's bitcoin account and USDT account have been closed because he receives payments too often," and that her boss was opening a new account.  (Id. at 36)  Yang later provided Jose with a new USDT account for the payment of the deposit.  (Id. at 37)  On March 9, 2023, Yang confirmed that her boss received "4972USDT."  (Id. at 39)

In preparation for the planned meeting in Bangkok, Yang asked Jose how many people would be attending from his side so she could "communicate with [her] boss to prepare in advance."  (Id. at 40)  On March 17, 2023, however, Yang told Jose that "[d]ue to some personal reasons, I can't go to Thailand to meet you this time.  One of my workmates will go to meet you instead of me," along with Yang's "boss."  (Id. at 41)  Yang then sent her colleague's telephone number to Jose, writing that "[t]his is my colleague's number, you can add her on WhatsApp, her name is Chiron Chen."  (Id. at 42)  Yang also sent Jose a phone number for her "boss," whom she identified as "Mr. Wang."  (Id.)

In advance of the planned Bangkok meeting, Wang created a private group chat composed of himself, Chen, and Yang.  (See GX 806-T; Tr. 1067-78)  In this chat, Yang told Wang and Chen that she had been communicating with a "Mexican client" named "Jose."  (GX 806-T at 2, 12)  At Chen's request, Yang forwarded her chat history with Jose to Chen.  (Id. at 14; GX 807-T (forwarded messages))  The forwarded messages referenced the CAS numbers for the three chemicals in the January 2023 shipment (1-boc-4-AP, 1-boc-4-piperidone, and

methylamine) and repeated Jose's statement that "[w]e make some ice and fentanyl," which would be "tested [with] some clients in NY and LA." (GX 807-T at 15, 20-21)

On March 23, 2023, "Gil" – a DEA confidential source posing as Jose's drug trafficking colleague – met with Chen and Wang at a Bangkok restaurant. (Tr. 406)[9] Gil covertly recorded the meeting, in both audio and video. (Tr. 398) The purpose of the meeting was to "talk about shipments," "chemicals," "logistics," and to ultimately reach agreement about the "purchase [of] more chemicals." (Tr. 405-06) Because Gil did not speak Mandarin and Wang did not speak English, Chen translated for both men during the meeting. (Tr. 482)

During the meeting, Gil told Chen in English that he was opening a lab in New York to make fentanyl. Chen then relayed to Wang in Mandarin that Gil "wants to open a chemical laboratory in New York," and to "use this product to make fentanyl." (GX 502B-T at 3)[10] Gil also explained to Chen and Wang that a batch of fentanyl he had made had been too strong and had killed "several Americans," and that Gil "need[ed] to balance . . . the purity." This exchange is set forth below:

| Speaker | Original Language | Translation |
|---------|-------------------|-------------|
| Gil | 'Cause, I mean, I make fentanyl, right? | |
| Chen | Mhmm. | |
| Gil | But it was strong | |
| Chen | Yes. | |
| Gil | So Americans, a couple—like several Americans, they died because it was too strong. | |
| Chen | Too strong? | |

---

[9] Jose – the DEA confidential source who had been in communication with Yang – did not attend the Bangkok meeting. Gil told Wang and Chen that Jose was "having problems with immigration." (Tr. 406, 697-98)

[10] The Defendants did not object to the accuracy of the translations introduced into evidence. (See Tr. 124-129, 133-40)

| | | |
|---|---|---|
| Gil | Yeah, tell him I need to balance, you know . . . | |
| Chen | The purity . . . | |
| Gil | Yeah, tell him. | |
| Chen | Down? The purity? | |
| Gil | Yeah. Tell him. | |
| Chen | 他说他做的芬太尼是太太太太狠了，然后有些美国佬会吃了，服用了之后会挂掉。他说他想把那个程度给[UI]。 | He said the fentanyl he made was too, too, too strong, and some Americans, after consuming, consuming it, would die. He said he wanted to bring the level [UI]. |
| Gil | Cause Americans, y'know? Pshh. | |
| Wang | 你就是和他说，产品[IA]，所以我觉得不要把货做得太浓，这是第一个。然后就是我们，第一我们保护原材料。这这这…因为我们有很多个墨西哥那边的客户。所以如果说您成品这一块有必要的话，我们可以从我们的客户那沟通，甚至我们在我们的论坛上，包括我们的技术，这个都可以沟通。我们或许可以帮到你，但是我们毕竟[UI]有限，而且没有那个合作，那么这一块核心的很多东西我们不想再再再…就是没有合作那么深的情况下，我们大家现在是…因为我们现在成功聊完之后，我也许真的有办法，或者我用，我动用我自己很多的能量，去帮你找到这些办法，但是后面… | You just tell him, the product [IA], so I think it's better not to make the product too concentrated, that's the first thing. And then, first, we protect the raw materials. This, this... Because we have many clients from Mexico, if there is a need for your finished product, we can communicate with our clients, even we can communicate on our forum, or communicate about our technology. Maybe we can help you, but after all, [UI] is limited, and without collaboration, regarding many core things in this area, we don't want to further, further... That is, without an in-depth collaboration, we all are... Because after we've successfully discussed this, maybe I really have a way, or I will use, I will use a lot of my own capability to help you find these solutions, but afterward... |

(GX 502C-T at 2-4)[11] Wang told Gil that "after we start working together, I will use my capacity to help you." (Id. at 5) Wang and Chen then discussed, in Mandarin, whether they could share the formula for fentanyl with Gil using an application that would cause the message to "disappear in a few days." (Id. at 7)

Gil, Chen, and Wang also discussed the logistics and challenges associated with trafficking fentanyl in the United States. For example, Gil told Chen that he had previously made fentanyl in Mexico "and then [would] take it to the U.S., so in the U.S. sometimes I lose product because of the legality behind it. . . . So I want to make sure that I make my labs in America, so that way I don't lose the product." (GX 502D-T at 2) Chen then relayed the substance of Gil's statement to Wang in Mandarin, including that "when crossing the border, it would be seized." (Id.) Wang responded that "in America our logistics are the fastest." (Id. at 3) Wang also stated that, "regarding the customs risk in the U.S., about 99% can be cleared, if not cleared. . . . If there are items failed to pass through customs, we may still bring the goods out through some other methods." (Id. at 4) Wang estimated that "perhaps 1 out of 1000 orders might be detained[.]" (GX 502M-T at 9) Wang also told Gil that "[a]dding 3 tons or 5 tons" to Amarvel Biotech's shipments of chemicals to the United States "is not an issue." (Id. at 6; see also id. at 9 (Chen telling Gil: "You can add 3 tons or 5 tons, it's not a problem because to America it's quite safe. We have a good line, special line to America, and very stable."))

During the Bangkok meeting, Gil, Chen, and Wang also discussed Amarvel Biotech's management. For example, when Gil asked Chen whether Wang was the "boss" and "[m]ain guy" at Amarvel Biotech (GX 502I-T at 2), Chen responded that "[w]e have two

---

[11] In the transcript, "UI" means unintelligible and "IA" means inaudible. (See, e.g., GX 502C-T at 1)

boss[es], one is [Wang], and another one now is in Japan." (Id.) Gil asked to meet the boss in Japan, and Wang told him that that would be "[n]o problem." (Id.) Wang also stated, however, that the "boss" in Japan "is not in charge of this area anymore," and that Wang "basically handle[d] the work in this area." (Id. at 3) Wang then placed a video call to "Mr. Xia," the boss in Japan. (Tr. 489) During the video call, Wang introduced Gil to Xia, and told Xia in Mandarin: "[T]he client . . . said to meet another boss, the boss in Japan. And then [I told him] I'm . . . the boss in charge of this piece of business." (GX 502I-T at 4 (first alteration added))

At the end of the Bangkok meeting, Chen told Gil that Yang would "communicate with you" regarding the planned upcoming order of chemicals. Gil suggested that Yang write in code, such as using "F for fentanyl." Chen assured Gil that Yang "will not write the name of the product." (GX 502Q-T at 3)

### 4. April – May 2023: The Second Shipment

After the Bangkok meeting, Chen created a WhatsApp group chat entitled "Mexico project" that included herself, Wang, Yang, Jose, Gil, and later Xia. (GX 402; Tr. 539-40)

On March 27, 2023, Gil wrote to the group requesting "[d]etails" for "what would be [b]est to produce muy material . . . for [b]est fentanyl . . . [a]s we discussed i[n] Bangkok 🖎 ." (GX 402 at 2-3) The following day, Yang sent the following chart to Jose. As shown below, the chart contains entries for 1-N-Boc-4-(Phenylamino)piperidine and N-(tert-Butoxycarbonyl)-4-piperidone[12] with the corresponding application as "Fentanyl":

---

[12] As discussed above, 1-N-Boc-4-(Phenylamino)piperidine is also known as 1-boc-4-AP, while N-(tert-Butoxycarbonyl)-4-piperidone is also known as 1-boc-4-piperidone.

| Product name | CAS | Application |
|---|---|---|
| ███████████████████ | ██████████ | |
| ███████████████████ | ████████████ | ████ |
| ███████████████████ | ██████████████ | |
| █████████████████████ | ██████████████ | |
| ███████████████████ | ██████████████ | |
| ████████████████████ | ██████████████ | |
| 1-N-Boc-4-(Phenylamino)piperidine | 125541-22-2 | |
| N-(tert-Butoxycarbonyl)-4-piperidone | 79099-07-3 | Fentanyl |

(GX 401 at 46)  At about the same time, Yang sent this chart to the "Mexico project" group chat, but with the "Application" column containing the word "Fentanyl" removed.  (GX 402 at 3)  In the group chat, Yang stated that "[i]n the table are our best-selling staple products."  She also stated that she would "confirm the other details with Jose in private."  (Id. at 4; Tr. 224-25)

Gil stated that the "[g]oal is to [b]uy everything from you the whole recipe to make Mc Donalds combos #1 #2 etc. . . . we talked about this.  To get final product."  (Id. at 6)[13] Chen responded that she had "described clearly your requires [sic] and our meeting conversations to Anita, she will handle it ☺ ."  (GX 402 at 6)[14]

---

[13]  Gil testified that his reference to McDonalds combo #1 meant fentanyl, and his reference to McDonalds combo #2 meant methamphetamine.  (Tr. 546)
[14]  Anita is Yang's "English name."  (Tr. 151, 169)

On April 10, 2023, Wang, Chen, Xia, and Gil had a video call, which Gil covertly recorded. On the call, Gil told Chen that he wanted "to make 50-55 kilos of the final product." (GX 503A-T at 4) Chen then relayed to Wang and Xia in Mandarin what Gil had said. Wang responded (in Mandarin), "[n]o problem." (Id. at 6) During the call, Chen asked, "[h]ow about your New York lab? Is . . . [it] under construction?" (Id. at 4) Gil responded that it was "getting there." (Id.)

On April 11, 2023, Gil placed an order in the "Mexico project" group chat for (1) 50 kilograms of 1-boc-4-AP; (2) 100 kilograms of propionyl chloride; and (3) 60 kilograms of 2-(bromoethyl)benzene.[15] (GX 402 at 8; Tr. 234-35, 567-68) DEA chemist Herdman testified that these three chemicals can be used to synthesize fentanyl. (Tr. 811-12)

The next day, Yang sent the group chat an invoice on Amarvel Biotech letterhead listing – by name, CAS number, and quantity – each chemical that Gil had ordered:

---

[15] Propionyl chloride and 2-(bromoethyl)benzene are not listed or scheduled substances under U.S. law. (Tr. 844)

4/12/23, 9:44 PM - Armavelbio Piperidine [Anita]: IMG-20230412-WA0000.jpg (file attached)



HUBEI AMARVEL BIOTECH CO., LTD

A: 6th Floor, Science and Technology Building, No. 164, Development Avenue
P :+86-18672759079   F:+86-27-87819568
W: http://www.amarvelbio.com/

**PROFORMA INVOICE**

Contact person:                                                    Invoice No: AB03230413

Address:                          Warehouse in USA near NY              Date:2023-4-12

Phone number:

| Items | CAS No. | Unit price(USD) | Quantity(KG) | Total price(USD) |
|---|---|---|---|---|
| 1-N-Boc-4-(Phenylamino)piperidine | 125541-22-2 | 700 | 50 | 35000 |
| Propionyl chloride | 79-03-8 | 60 | 100 | 6000 |
| (2-Bromoethyl)benzene | 103-63-9 | 80 | 60 | 4800 |
| CREDIT AMOUNT: | | | $4,973 | |
| BALANCE AMOUNT: | | | $40,827 | |
| Total AMOUNT: | | | $45,800 | |

| Seller's virtual currency account | |
|---|---|
| USDT ERC 20 | 0x8a75305ad831c0416323f9c32d251604600c952f |
| USDT TRC 20 | TMQYraXCquzcukWoLQud4o1YHR8hgWr1J6 |
| BITCOIN | 38MNZmrUE7Wpp6HHQeb4rcybo2EjIhw1iZ |

Seller's bank information:

Account Name:       Hubei Amarvel Biotech Co.Ltd
Account Number:     798851652303176
Bank Name:          DBS Bank (Hong Kong) Limited
Bank Address:       11th Floor, The Center, 99 Queen's Road Central, Central, Hong Kong
Country/Region:     Hong Kong
SWIFT Code:         DHBKHKHH
Bank Code:          016
Branch Code:        478

(GX 402 at 10)  The invoice provided for delivery to a "[w]arehouse in USA near NY." (<u>Id.</u>)

The total price for the order was $45,800,[16] payable in – <u>inter</u> <u>alia</u> – the cryptocurrency USDT.

(<u>Id.</u>)

       After confirming the order, Yang told Jose that "[b]ecause the product 125541-22-

2" – the CAS number for 1-boc-4-AP – "is very special, we can only customize the production

after determining the customer's demand."  As a result, Jose might need to wait for "the

production time." (GX 401 at 58-59)  As an alternative, Yang suggested that Jose consider a

---

[16]  As discussed above, Jose paid Amarvel Biotech a $5000 deposit by USDT in advance of the
Bangkok meeting.  (GX 401 at 35, 39)  Amarvel Biotech applied the $5000 payment – which
amounted to $4973 in USDT – towards the total price, leaving a balance of $40,827.  (<u>See</u> GX
402 at 10)

different fentanyl precursor chemical, CAS 79099-07-3 (1-boc-4-piperidone), and assured Jose that "[w]e can provide the method of making ANPP with 79099-07-3."[17] (Id. at 59)  After Jose expressed irritation regarding the proposed change (GX 401 at 58; Tr. 239-40), Yang advised that the 1-boc-4-AP was back in stock and available to ship after all.  (GX 401 at 60; GX 402 at 11-12; Tr. 241)

On April 14, 2023, Yang confirmed that Amarvel Biotech had received the remaining balance for the order.  (GX 402 at 12)  The cryptocurrency wallet that received the money was registered to Wang.  (GX 304-T; Tr. 242-43)

On April 28, 2023, Yang informed Jose that "[t]he goods have arrived in the warehouse" in Los Angeles.  (GX 401 at 61)  In the "Mexico project" group chat, Yang explained that "New York, the United States, has been strict in checking the precursors of the 'final product' some time ago, so for the sake of safety, this time it is sent to California."  (GX 402 at 18; Tr. 246-47, 572)  Jose understood Yang to be "saying basically they are afraid that the customs in New York would seize the merchandise."  (Tr. 247)

On May 5, 2023, DEA agents took custody of the shipment of precursor chemicals that Amarvel Biotech had delivered to the Los Angeles warehouse.  (GX 1006; Tr. 750-51; see also GX 106 (photograph of the eight boxes in the shipment))

According to DEA forensic chemist Fracia Martinez, the shipment contained:  (1) approximately 105 kilograms of propionyl chloride; (2) approximately 68 kilograms of 2-

---

[17] DEA Chemist Herdman testified that ANPP (also known as 4-ANPP) is an "immediate precursor" of fentanyl.  An "immediate precursor" is "a substance that is essentially one step removed from the final product.  So it only takes one chemical reaction to get to whatever you're trying to make."  (Tr. 802, 817)  Dr. Herdman also testified that ANPP can be synthesized from 1-boc-4-piperidone.  (Id. 816-17)

(bromoethyl)benzene; and (3) approximately 50 kilograms of ortho-methyl-N-boc-4-AP.[18]  (Tr. 771, 776-78; see also Tr. 809, 819 (discussing alternate chemical names for these substances))

Dr. Herdman testified that ortho-methyl-N-boc-4-AP can be used in the same manner as 1-boc-4-AP to synthesize ortho-methylfentanyl, which is identical to fentanyl except for the substitution of a single hydrogen atom with a methyl group.  (Tr. 821-22)[19]

### 5.    June 2023:  The Fiji Meeting

In a May 9, 2023 call with Wang, Chen, Xia, and another DEA confidential source posing as an investor, Gil stated that he wanted to purchase the same chemicals that Amarvel Biotech shipped to California in April, but this time wanted "three tons in total."  (GX 504A-T at 2)  In response, Defendant Wang asked Gil to "pay a deposit," and to do so before a contemplated meeting in Fiji at which Gil's proposed transaction could be finalized.  (Id. at 6)

Yang later negotiated the details of the deposit with Jose; the two agreed on $20,000, and Yang confirmed receipt of the deposit in the "Mexico project" group chat on May 16, 2023.  (GX 401 at 75; Tr. 257-58; GX 402 at 27-28)

On June 8, 2023, Wang and Chen met with Gil at a restaurant in Fiji.  Gil covertly recorded the meeting by audio and video.  (Tr. 430-32; GX 405 at 8)  At the meeting, Gil, Chen, and Wang discussed Gil's proposed multi-ton purchase of precursor chemicals, and agreed on a price of $1.5 million.  (Tr. 607)  The participants also discussed potential consequences if U.S. authorities seized the shipment.  For example – after Chen translated Gil's statement that he paid

---

[18]  Ortho-methyl-N-boc-4-AP – also known as tert-butyl 4-(2-methylanilino)piperidine-1-carboxylate – is not a listed or scheduled substance under U.S. law.  (Tr. 819, 844)
[19]  Heather Harris, a chemist called by Defendant Wang, testified that ortho-methylfentanyl is a fentanyl analogue and a fentanyl-related substance.  (Tr. 1104 ("Q. . . . I think you had testified that ortho-methyl-N-boc-4-AP was a precursor to a fentanyl analogue.  What analogue did you have in mind?  A.  Ortho-methylfentanyl."); Tr. 1106 ("Q.  Do you believe ortho-methylfentanyl is a fentanyl-related substance?  A.  Yes."))

Mexican officials so "I don't have problems" – Wang asked, "[h]ow about the United States . . . [w]ill it be inspected by the U.S. Customs? If it was inspected by the U.S. Customs, what would happen after that? . . . [I]f it was inspected in the United States it could potentially trigger . . . a reexamination . . . like Shuokang." (GX 505A-T 2-4; Tr. 1049) Wang appeared to be referring to Wuhan Shuokang Biological Technology Co., Ltd. ("Shuokang"), a Chinese chemical company. (GX 253-T; Tr. 1046)

The browsing history for Chen's cellphone indicates that on April 15, 2023, she searched "voachina fentanyl" and viewed three Voice of America articles published in Mandarin. (GX 802; Tr. 1038-39) One of the articles states that the United States government has sanctioned Shuokang for supplying "Mexican drug cartels with precursor chemicals for the production of illegal fentanyl intended for the U.S. market," and has charged three Shuokang employees with "fentanyl importation and money laundering." (GX 253-T at 2; Tr. 1045-47) After Wang's reference to "Shuokang," Chen explained to Gil that "recently [the] American government uh seized some Mexican, Mexican group and uh, they, they follow the route to China" and found "[our] [c]ompetitor in China," which was "bad news for us." (GX 505B-T at 4)

At the conclusion of the Fiji meeting, Fijian law enforcement officers placed Wang and Chen under arrest. (Tr. 430-31, 611) Wang and Chen were then taken to the airport, transferred to DEA custody, and flown to Hawaii on a DEA plane. (Tr. 433-34)

**B.**   <u>**The Defense Case**</u>

At trial, Defendant Wang called Heather Harris, a chemistry professor at Arcadia University. (Tr. 1085) Harris testified that propionyl chloride, 2-(bromoethyl)benzene, and ortho-methyl-N-boc-4-AP (the three chemicals that Amarvel Biotech delivered to Los Angeles in April 2023) are "building block[s] for fentanyl." (Tr. 1088-89) Harris emphasized, however,

that one must "create the right chemical environment for these chemical reactions to occur." (Tr. 1089) Someone planning to synthesize fentanyl would need "reagents," "solvents," and "things like PH adjustment, whether you are using acids or bases, and temperature and time." (Id.) Harris also testified that none of the chemicals Amarvel Biotech agreed to ship to the United States in the proposed June 2023 shipment are listed chemicals. (Tr. 1091)[20]

Harris also testified that

1. ortho-methyl-N-boc-4-AP – one of the chemicals Amarvel Biotech delivered to Los Angeles in April 2023 – is a precursor to the fentanyl analogue ortho-methylfentanyl, which is a "controlled substance" and a "fentanyl-related substance" (Tr. 1104-06);

2. 1-boc-4-AP, propionyl chloride, and 2-bromoethyl benzene are all elements of fentanyl's chemical structure (Tr. 1107);

3. 1-boc-4-AP – one of the chemicals Amarvel Biotech delivered in the January 2023 shipment – is a listed chemical (id.); and

4. methylamine – which was part of the January 2023 shipment – is a listed chemical (Tr. 1110).

Defendant Chen testified in her own defense. Chen stated that she had built websites for a number of "international trade" companies in China, including Ross Technology, Amarvel Biotech, Wuhan Wingroup, and Frisky.[21] (Tr. 1135) At each of these companies, Chen "appl[ied] for domain names, buil[t] the architecture of the websites, determine[d] the

---

[20] Harris explained that "the DEA has created lists of chemicals that are not drugs, so people aren't ingesting these to get effects, but these are chemicals that you could use in this synthesis process to make drugs. So the list chemicals contain chemicals that have been identified as showing up in the various synthesis reactions that are available, not only for fentanyl, but for other drugs that are out on the market as well." (Tr. 1091)

[21] Ross Technology provides "network technology services," primarily for "international trade companies in China." (Tr. 1127) Wuhan Wingroup is an "international trade company" that sells "pharmaceutical intermediate[s]," "active pharmaceutical ingredients," and "plant extracts." (Tr. 1127-28) It shares office space with Amarvel Biotech. (Tr. 1128-29) Frisky was "established by Mr. Xia in Japan" and sells "lithium batter[ies] and new energy products." (Tr. 1128)

characteristics, the color of the website, etc., and also the main pages, including the home page,

the 'about us' page, the 'contact us' page, etc." (Tr. 1135-36) At each company, salespeople

were "responsible for uploads of the product information." (Tr. 1136)

Chen testified that she did not recognize Amarvel Biotech product webpages for

1-boc-4-AP, 1-boc-4-piperidone, and methylamine that were displayed on various Amarvel

Biotech websites. (Tr. 1136-40) She also testified that she did not recognize an Amarvel Biotech

product page containing a photograph of 1-boc-4-piperidone powder. A nearly identical

photograph was recovered from her laptop, however. (Compare GX 719 (photograph of 1-boc-4-

piperidone powder found on Chen's laptop) with GX 203 (Amarvel Biotech webpage with the

same photograph contained in GX 719, with the "AmarvelBio" logo added))

As to the meetings with the DEA confidential sources, Chen testified that she

received a "temporary assignment" to "assist Mr. Wang with translation." (Tr. 1144-45) She was

present at these meetings solely as an "[i]nterpreter," and did not have any responsibilities

regarding the business aspects of the meetings. (Tr. 1184)

Chen acknowledged that fentanyl was discussed at these meetings, and recalled

that

> [Gil] said he would manufacture the product, and he also asked manager Wang
> for [the] formula. And he mention[ed] that the people will die if it was too
> concentrated, and he said he wanted to build grand labs in New York, and he
> wanted to find a professional team to assist him to develop a better, safer product
> that way he could save lives.

(Tr. 1193) When asked what she had understood Gil to mean when he said he wanted to set up a

lab to make fentanyl in New York, Chen testified that she understood Gil "wanted better

technical support so that he could make better and safer fentanyl." (Tr. 1248-49)

As to her WhatsApp communications, Chen testified that while she had received Yang's prior communications with Jose – which Yang had forwarded to Chen – she was "too busy" and therefore "didn't really review [them]." (Tr. 1185)

As to the <u>Voice of America</u> articles regarding the U.S. government's efforts to combat fentanyl trafficking by Mexican drug cartels using chemicals produced by Chinese chemical companies, Chen admitted that she had read these articles, but stated that she found them "very confusing." (Tr. 1196)

Finally, Chen testified that no one ever warned her that she was violating U.S. law by participating in these transactions as she did. (Tr. 1195, 1237, 1240, 1244-45, 1250) She also did not understand that Gil intended to violate U.S. law. (Tr. 1249)

## II.   **PROCEDURAL HISTORY**

### A.   **Wang's Rule 29(a) Motion**

On January 23, 2025, after the close of the Government's case-in-chief, Wang and Chen orally moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). (Tr. 1084) The court deferred ruling on those motions until after the trial day. (<u>Id.</u>) After the jury left for the day, Wang's counsel stated that he wanted to submit a written Rule 29 motion. The Court directed Wang's counsel to submit his motion by January 27, 2025. (Tr. 1112) Wang submitted a written Rule 29(a) motion on that date, but Chen did not.[22] (<u>See</u> Dkt. No. 127)

In his motion, Wang argued that

1. all counts should be dismissed for lack of venue (<u>id.</u> at 1-3);

2. he was entitled to a judgment of acquittal on Count One because there was "no evidence of any agreement to manufacture ortho-methylfentanyl" (<u>id.</u> at 3-4);

---

[22] On January 27, 2025, Chen's counsel informed the Court that while he had not submitted a written Rule 29 motion, he had "reviewed co-counsel's motion" and "join[ed] in that motion for now." (Tr. 1118) Chen's counsel stated that "we do plan on submitting something in writing shortly." Chen did not file any written Rule 29 motion prior to the jury's verdict, however. (<u>Id.</u>)

3.   he was entitled to a judgment of acquittal on Counts Three and Four because "there was no testimony as to Mr. Wang's involvement in the shipment of chemicals received on January 18, 2023" (id. at 4-5); and

4.   the importation of methylamine charged in Count Four was not unlawful because it did not meet the one kilogram threshold triggering the reporting requirement set forth in 21 C.F.R. § 1310.04. (Id. at 5-6).

In his motion, Wang also argued that the Court's jury charge should include an instruction on

entrapment. (Id. at 6-10)

In a January 28, 2025 bench ruling, this Court rejected Wang's arguments. As to

venue, this Court ruled that a reasonable juror could find venue by a preponderance of the

evidence as to Counts One, Two, and Five, given a May 10, 2023 video call in which a DEA

confidential source was in Manhattan, told the participants (including Wang and Chen) that he

was in Manhattan, and the participants discussed the ongoing conspiracy to ship precursor

chemicals to manufacture fentanyl, as well as payment for those chemicals. (Tr. 1261-62 (citing

Tr. 577-83; GX 504A, 504B, 504A-T, and 504B-T)) As to Counts Three and Four, the Court

ruled that a reasonable juror could find venue based on the movement of the January 2023

shipment over the contiguous waters of the Southern District of New York. (Tr. 1262)

As to whether there was sufficient proof of an agreement to manufacture ortho-

methylfentanyl, the Court ruled that the jury could reasonably infer such an agreement given that

the chemicals the Defendants shipped to Los Angeles in April 2023 could be synthesized to

create ortho-methylfentanyl. (Tr. 1264-65)

As to Wang's alleged lack of involvement in the January 2023 shipment, the

Court ruled that "a reasonable juror could infer that Wang approved the January 2023 shipment,"

given Yang's references to her "boss" approving the order, and her later identification of Wang

as her "boss." (Tr. 1265 (citing GX 806-T)) The Court also noted that – as to the conspiracy

charged in Count Two – "even if Wang did not participate in that alleged conspiracy prior to March 2023, a judgment of acquittal would not be appropriate because 'one who joins an existing conspiracy takes it as it is and is therefore held accountable for the prior conduct of co-conspirators.'" (Tr. 1265-66 (quoting United States v. Bengis, 783 F.3d 407, 413 (2d Cir. 2015))

As to Wang's argument concerning the methylamine reporting requirement, this Court ruled that "the reporting requirement . . . is not triggered unless the person importing the listed chemical is registered" under the applicable DEA regulations. "[W]here, as here, none of the participants had registered with the DEA to import methylamine," the reporting requirement is irrelevant. (Tr. 1266-67) The Court also concluded that a reasonable juror could find that "Wang knew and intended that the methylamine he sent would be unlawfully imported into the United States," given Wang and Chen's references to the possibility that their shipments of chemicals could be interdicted by customs agents or law enforcement. (Tr. 1267 (quoting GX 505C-T))

As to Wang's request for an entrapment charge, this Court noted that the Second Circuit had instructed that "'where a government agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime, the latter person is not entitled to a derivative entrapment charge.'" (Tr. 1270 (quoting United States v. Pilarinos, 864 F.2d 253, 256 (2d Cir. 1988)) Here, a DEA confidential source contacted Yang, and it was Yang who induced Wang and Chen's involvement in the alleged drug trafficking activity. (Tr. 1271) The Court also reasoned that "there is no evidence that these defendants were induced by the government to commit the crime," given that "the defendants and their co-conspirators advertised their chemical precursor business before the DEA informants contacted [Yang] in November 2022." (Tr. 1272-73)

### B.    Summations and Jury Verdict

In summation, Wang's counsel argued that this case had been "created and orchestrated by the DEA." In Wang's mind, "this was a regular, run-of-the-mill, garden-variety business deal" to sell "chemicals," and "chemicals are not fentanyl." (Tr. 1388, 1396) Wang also argued that the Government had not proven venue as to the counts relating to the January 2023 shipment, because the Government witness who testified as to how the package would have been delivered "admits that he knows nothing about this package." (Tr. 1403)

Chen's lawyer argued that Chen thought she was doing a "legitimate deal," and was merely acting "as a translator" and "nothing more" in her interactions with the DEA confidential sources. (Tr. 1415-16) Chen's counsel also argued that the Amarvel Biotech website evidence was "useless" because there was no evidence that Chen had read, reviewed, or produced the website pages cited by the Government. (Tr. 1420) Chen's counsel also emphasized that no one had ever told Chen that she was violating U.S. law. (Tr. 1421)

On January 29, 2025, the jury returned the following verdict:

| Count | Wang | Chen |
|---|---|---|
| Count 1: Fentanyl and Fentanyl Related Substance Conspiracy | Not Guilty | Not Guilty |
| Count 2: Conspiracy to Import 1-boc-4-AP | Guilty | Guilty |
| Count 3: Importation of 1-boc-4-AP | Guilty | N/A |
| Count 4: Importation of Methylamine | Guilty | N/A |
| Count 5: Conspiracy to Commit Money Laundering | Guilty | Guilty |

(Verdict Sheet (Dkt. No. 134))

## DISCUSSION

On February 12, 2025, Wang and Chen moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c).  (See Wang Mot. (Dkt. No. 135); Chen Not. of Mot. (Dkt. No. 136); see also Chen Br. (Dkt. No. 138); Am. Chen. Br. (Dkt. No. 141))[23]  Chen also seeks, in the alternative, a new trial pursuant to Fed. R. Crim. P. 33.  (Am. Chen Br. (Dkt. No. 141) at 13-14)

## I.  LEGAL STANDARDS

### A.  Rule 29 Motions

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In evaluating a sufficiency challenge, [a court] 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see also United States

---

[23]  Rule 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(c)(1).  The jury returned its verdict and was discharged on January 29, 2025.  (See January 29, 2025 Minute Entry; Verdict Sheet (Dkt. No. 134))  On February 12, 2025, Chen timely filed a Notice of Motion seeking relief under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Not. of Mot. (Dkt. No. 136))  The accompanying memorandum of law was filed on February 13, 2025, however, after the Rule 29(c)(1) deadline.  (See Chen Br. (Dkt. No. 138))  Chen also filed an amended memorandum of law on February 18, 2025.  (See Am. Chen Br. (Dkt. No. 141))  Chen's counsel explained in a February 18, 2025 letter that the amended brief "contains one additional case citation" and "a few non-substantive edits."  (Feb. 18, 2025 Chen Ltr. (Dkt. No. 142) at 1)  In any event, the Government has not argued that any component of Chen's motion is untimely, and cites to Chen's amended brief when addressing her arguments.  (See Govt. Opp. (Dkt. No. 143) at 5 (citing Dkt. No. 141))  Given these circumstances, the Court will accept Chen's submissions as timely.

v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.") (citation omitted).  In assessing a sufficiency challenge, "[t]he evidence is to be viewed 'not in isolation but in conjunction.'"  Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'"  United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alteration in DiPietro).  "[T]he task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court."  United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) (citation omitted).  Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a conviction based on insufficient evidence."  United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

A court "may reverse a guilty verdict only if 'evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  United States v. Ng Lap Seng, 934 F.3d 110, 130 (2d Cir. 2019) (quoting United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005)).

**B.**    **Rule 33 Motions**

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  "Rule

33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, see United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001).

However, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (quoting Sanchez, 969 F.2d at 1414). "[U]nder this standard, a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" Id. at 188 (quoting United States v. Robertson, 110 F.3d 1113, 1118 (5th Cir. 1997)). "To the contrary, absent a situation in which the evidence was 'patently incredibly or defie[d] physical realities,' . . . or where an evidentiary or instructional error compromised the reliability of the verdict, . . . a district court must 'defer to the jury's resolution of conflicting evidence." Id. at 188-89 (quoting first Ferguson, 246 F.3d at 134, and then United States v. McCourty, 562 F.3d 458, 475-76 (2d Cir. 2009)). "And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." Id. at 189 (citing United States v. Middlemiss, 217 F.3d 112, 117 (2d Cir. 2000)).

## II.    ANALYSIS

### A.    Wang's Rule 29(c) Motion

Defendant Wang has moved under Fed. R. Crim. P. 29(c) for a judgment of acquittal on Count Four, which charges him with manufacturing and distributing a listed

chemical – methylamine – knowing and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C § 959(a). (Wang Mot. (Dkt. No. 135)) Wang contends that the Government offered "no evidence linking Mr. Wang to the January 2023 methylamine shipment" and "provided no evidence that Mr. Wang had any knowledge of methylamine[.]" (Id. at 1)

### 1.     Wang's Involvement in the January 2023 Methylamine Shipment

In arguing that the Government offered no evidence of his involvement in the January 2023 methylamine shipment, Wang repeats the same arguments he made at the close of the Government's case, pursuant to Rule 29(a). (See Jan. 27, 2025 Wang Mot. (Dkt. No. 127) at 4 ("[T]here was no testimony as to Mr. Wang's involvement in the shipment of chemicals received on January 18, 2023.")) As discussed above, this Court rejected that argument in a January 28, 2025 bench ruling. In so ruling, this Court noted that Yang – who dealt with the DEA source Jose and who organized and facilitated the January 2023 shipment – "repeatedly referenced her 'boss' in approving [the January 2023] order." (Tr. 1265 (citing GX 401 at 15-16)) For example, in a December 9, 2022 WhatsApp message to Jose, Yang wrote: "And how much did your friend pay? I need to check with my boss, otherwise my boss will not arrange the delivery." Yang later told Jose, "[m]y boss said the money has been received. . . . I will apply for delivery to my boss." (GX 401 at 15-16) And Yang later told Jose that her "boss" was "Bruce Wang." (Tr. 1265 (citing Tr. 168); see also GX 401 at 42-43) As the Court noted, Yang's reference to Wang as her "boss" was consistent with Wang's statement that he "ha[d] the final say" at Amarvel Biotech. (GX 806-T at 54) Given this evidence, "a reasonable juror could infer that Wang approved the January 2023 shipment." (Tr. 1265)

The same reasoning applies to Wang's renewed Rule 29 motion: the evidence indicated that Yang's boss was Wang, and that Wang – in his capacity as Yang's boss – had authorized and approved the January 2023 shipment.

Wang attempts to avoid this conclusion by speculating that Yang could have been referring to "Mr. Xia, the boss in Japan." (Wang Mot. (Dkt. No. 135) at 2 (citing GX 502I-T at 2)) While there was evidence that Xia was a "boss" at Amarvel Biotech (see, e.g., GX 502I-T (Chen, telling Gil: "We have two boss: one is [Wang], and another one now is in Japan."), there was ample evidence that Wang was in charge of day-to-day operations at the company, including the methylamine transaction. (See, e.g., GX 502I-T at 3 (Wang telling Gil that Xia "is not in charge of this area anymore. He is working on . . . the design institute in China. I basically handle the work in this area."); id. at 4 (Wang telling Xia, "I'm the boss in charge of this piece of business[.]"); GX 806-T at 54 (Wang asking Yang to tell Jose that "Director Xia is not responsible for any actual work, and Director Wang has the final say over here."))

Wang also argues that "[t]he government knows that the payment for the January 2023 order was sent to a person known as Xia Guang, as provided in the cryptocurrency records in the government's discovery." (Wang Mot. (Dkt. No. 135) at 2) But no such evidence was offered at trial, and "Rule 29 . . . only authorizes motions challenging the sufficiency of the evidence presented at trial." United States v. al Ghazi, No. S307CR354(JSR), 2009 WL 1605741, *2 (S.D.N.Y. June 9, 2009) (citing Fed. R. Crim. P. 29; United States v. McDaniel, No. 03 CR. 550, 2004 WL 1057627, at *1 (S.D.N.Y. May 10, 2004)). Rule 29 does not address evidence that a defendant chose not to introduce at trial.

In sum, a reasonable juror could have inferred that the "boss" Yang referred to during the methylamine transaction was Wang. United States v. Clarke, 979 F.3d 82, 91 (2d Cir.

2020) ("We must credit inferences that the jury could reasonably have drawn in the Government's favor.") (citation omitted).

2.    **Wang's Knowledge of Methylamine**

Wang also argues that "the government provided no evidence that Mr. Wang had any knowledge of methylamine[.]"  (Wang Mot. (Dkt. No. 135) at 1)

This Court instructed the jury that the Government could meet its burden as to knowledge of methylamine either by "prov[ing] that Mr. Wang knew that the chemical[] at issue in Count[] . . . Four [was] . . . methylamine," or by "prov[ing] that Mr. Wang knew that the substance at issue . . . [is] controlled or regulated by the United States federal drug laws, regardless of whether he knew that [the] substance[] [was] . . . methylamine."  (Tr. 1514); see also McFadden v. United States, 576 U.S. 186, 188-89 (2015); United States v. Demott, 906 F.3d 231, 244 (2d Cir. 2018).  Based on the evidence at trial, a reasonable juror could have found that Wang had the required knowledge under either option.

As to the first avenue – and as discussed above – a reasonable juror could have concluded that Wang was the "boss" who approved the January 2023 transaction.  Moreover, Wang demonstrated familiarity with the January 2023 transaction at the Bangkok meeting.  During that meeting, Gil asked Chen – in English – for "help" about "what else do I have to complete a good balance to make my product good quality?"  (GX 502O-T at 15)  Chen then asked Wang in Mandarin, "what supplementary materials should be introduced . . . to him?"  (Id. at 17)  Wang responded:  "The supplementary materials are among the ones he bought!"  (Id.)  He then added:  "Methylamine. Methylamine is the supplementary material."  (Id.)  Chen then asked "what about ammonium salt?"  Wang explained that "[y]es . . . ammonium salt is then refined into methylamine."  (Id.)  During that same meeting, Wang again referred to "methylamine" in the context of a discussion about shipping logistics and clearing U.S. customs.

At another point in the meeting, Wang acknowledged that Gil had bought "three products" in connection with the earlier shipment. (GX 502J-T at 4) Given Wang's references to methylamine and to Gil's prior purchase of "three products" in January – a purchase that included methylamine – a reasonable juror could infer that Wang had approved the January 2023 shipment and was aware that it contained methylamine.

As to Wang's knowledge that the substance at issue was controlled or regulated under U.S. law, the Supreme Court addressed the necessary level of knowledge in McFadden v. United States, 576 U.S. 186 (2015), a case brought under the Controlled Substance Analogue Enforcement Act of 1986. In McFadden, the Court cited a defendant's "knowledge that a particular substance is subject to seizure at customs" as an example of circumstantial evidence sufficient to prove a defendant's knowledge that a substance is controlled or regulated under U.S. law. McFadden, 576 U.S. at 192 n.1; see also Demott, 906 F.3d at 252 (Wesley, J., concurring) (evidence that a defendant was aware of potential for seizure at customs "supports the knowledge element[,] because it raises an inference that the defendant was aware of the substance's legal status").

In the instant case, the Government offered ample evidence that Wang was aware that the chemicals Amarvel Biotech was shipping to the DEA confidential sources in the United States were subject to seizure. Indeed, during the Bangkok meeting, Wang bragged about Amarvel Biotech's ability to evade U.S. customs, stating that "[t]he security to the US is still top notch; perhaps 1 out of 1000 orders might be detained." (GX 502M-T at 9) He also stated that "if there are issues" with a particular shipment "at customs, we can say, okay, we can respond immediately. We'll know right away whose shipment it is and which bill of lading had an issue, [and] we can promptly deal with customs and figure out a solution to clear it." (Id. at 8) And

with respect to the potential "customs risk," Wang represented that, "[i]f there are items [that] failed to pass through customs, we may still bring the goods out through some other methods." (GX 502D-T)  Given Wang's repeated allusions to the "customs risk" associated with the chemicals he was selling to the DEA sources, a reasonable juror could have inferred that he was that the precursor chemicals he was shipping to the United States were regulated or controlled under U.S. law.

Wang argues, however, that for aiding and abetting liability to apply, "'a jury must find that the defendant had the specific intent to commit the underlying substantive offense; mere knowledge is not enough.'"  (Wang Mot. (Dkt. No 135) at 2 (quoting United States v. Dambelly, 714 F. App'x 87, 89-90 (2d Cir. 2018))  And while Wang may have been a "boss" at Amarvel Biotech, and while there "may be sufficient circumstantial evidence to establish knowledge of a potential criminal objective, 'mere knowledge is not enough.'"  (Id. (quoting Dambelly, 714 F. App'x at 89-90))  As discussed above, however, a reasonable juror could have found not only that Wang was a "boss" at Amarvel Biotech who knew about the January 2023 shipment, but also that he approved the order after Yang applied to him for authorization to make "shipment" and "delivery."  (GX 401 at 15-16; Tr. 169-70)  In sum, a reasonable juror could have found that Wang had the specific intent to commit the crime charged in Count Four.

United States v. Frampton, 382 F.3d 213 (2d Cir. 2004) – cited by Wang (see Wang Mot. (Dkt. No. 135) at 2) – is not to the contrary.  There, defendant Johnson was the alleged "triggerman" in a murder-for-hire scheme and was charged with, inter alia, aiding and abetting defendant Frampton's commission of a violent crime in aid of racketeering.  Id. at 216-17.  To obtain a conviction, the Government was required "to prove that at the time Johnson assaulted [the victim], he knew that Frampton [ – the person who had directed the murder – ] was

seeking to increase his position in the [alleged racketeering] enterprise and acted toward that end." Id. at 223.  On appeal, however, "the Government conceded that it could point to no direct evidence demonstrating that Johnson knew of [the principal's] criminal intent, i.e., his desire to enhance his position in the [alleged racketeering] enterprise," and held that "the circumstantial evidence proffered by the Government to support such an inference – that Johnson and [a friend of Frampton] were friends, and therefore Johnson must have realized the real purpose behind his role in the plot to murder [the victim] – is far too attenuated." Id.  Wang argues that "[h]ere, just as in Frampton, there is no direct evidence demonstrating that Mr. Wang knew of [Yang's] intent to manufacture or distribute methylamine."  (Wang Mot. (Dkt. No. 135) at 2)

        Wang is wrong, however, because there is direct evidence that Wang approved the January 2023 shipment of methylamine.  As discussed above, a reasonable juror could have found that Wang was Yang's "boss," and that Wang – at Yang's request – approved the January 2023 shipment of chemicals to Jose in America.  And as is also discussed above, there is ample evidence that Wang was aware that the chemicals shipped in January 2023 were controlled and regulated under U.S. law, given his repeated allusions to the risk of seizure at customs.

                        *        *        *        *

        Because a reasonable jury could have found that Wang approved the January 2023 shipment (which included 894 grams of methylamine) and that – in doing so – he either knew that the shipment contained methylamine, or knew that the substance in the shipment was controlled by or regulated under U.S. law, Wang's motion for a judgment of acquittal on Count Four – manufacturing and distributing a listed chemical, methylamine, knowing and having reasonable cause to believe that it would be unlawfully imported into the United States – will be denied.

B.      **Chen's Motion**

Defendant Chen moves for a judgment of acquittal pursuant to Rule 29, or in the alternative for a new trial pursuant to Rule 33, on Count Two (conspiracy to import 1-boc-4-AP) and Count Five (conspiracy to commit money laundering).  (Am. Chen Mot. (Dkt. No. 141) at 9)

1.      **Rule 29 Motion as to Count Two**

Chen contends that she is entitled to a judgment of acquittal on Count Two because the Government "presented no evidence that Ms. Chen intended, knew, or had reasonable cause to believe that 1-boc-4-AP would be unlawfully imported into the United States." (Id. at 10)  Indeed, according to Chen, "[t]he Government presented no evidence that [she] affirmatively knew that 1-boc-4-AP was a chemical that [the confidential sources] hoped to purchase from Hubei Amarvel." (Id. at 11)

The evidence concerning Chen's knowledge that the objective of the charged conspiracy was to unlawfully import 1-boc-4-AP into the United States includes the following:

- the messages that Yang forwarded to Chen prior to the March 2023 Bangkok meeting, which included Yang's communications with Jose concerning 1-boc-4-AP and the chemicals shipped in January 2023, the CAS numbers for these chemicals, and Jose's statement that "[w]e make some ice and fentanyl" and will "test[] whit [sic] some clients in NY and LA" (GX 807-T at 15, 20-21; Tr. 1073-74);

- the Amarvel Biotech websites, which were registered and overseen by Chen, and which advertised the sale of 1-boc-4-AP by chemical name and CAS number, along with its potential use in manufacturing fentanyl (GX 204, 208, 212, 215, 218; Tr. 941-42, 954, 961-62, 965-66, 975-77);

- the "Mexico Project" group chat with Chen, Wang, Yang, Jose, and Gil, during which Gil ordered 1-boc-4-AP by CAS number (GX 402 at 8; Tr. 234-41, 567-69);

- the April 12, 2023 invoice, circulated by Yang to Chen, Wang, Jose, and Gil in the group chat, which listed 1-boc-4-AP by chemical name and CAS number and specified delivery to a "[w]arehouse in USA near NY" (GX

34

402 at 10; Tr. 237-38, 568-71);

- the May 9, 2023 video call with Chen, Gil, Wang, and Xia, during which Gil said that he wanted to purchase fifteen times the quantity of each chemical that had previously been purchased in April 2023, and Chen displayed a note showing the first five digits of the CAS number of 1-boc-4-AP (GX 504A; GX 504A-T, Tr. 579-82);

- Amarvel Biotech ads and promotional material recovered from Chen's laptop concerning 1-boc-4-AP (GX 722, 743, 744, 746 (referring to 1-boc-4-AP by CAS number); GX 745 (text file containing a product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives")); and

- the recorded conversations in which Chen demonstrated awareness that the chemicals being shipped to the U.S. were subject to seizure by U.S. Customs and law enforcement.  (GX 502M-T at 9 ("[T]o America it's quite safe.  We have a good line, special line to America, and very stable.  The successful rate:  maybe 1,000 times, the customs will have one time problem."); GX 505C-T at 3 (Chen asking Gil what would happen "[i]f our products are blocked by the police"); GX 502D-T (Chen translating Wang's statements regarding "customs risk" and claim that Amarvel Biotech's "[s]uccessful rate is about . . . 99 percent"))

From this evidence, a reasonable juror could have found that Chen intended, knew, or had reasonable cause to believe that 1-boc-4-AP was a chemical that the DEA confidential sources wished to purchase from Amarvel Biotech for unlawful importation into the United States.

Chen argues that the Government did not prove the object of the conspiracy, however, because the DEA sources never "expressly stated" that (1) "they were members of a Mexican Drug Cartel"; (2) "they were not licensed to manufacture fentanyl in the United States"; and (3) "by merely acting as a translator in these conversations [Chen] was violating the narcotic[s] laws of the United States."  (Am. Chen. Mot. (Dkt. No. 141) at 10)

But it was not necessary for the DEA sources to say that they were members of a Mexican drug cartel, or that they had no license to manufacture fentanyl, in order for the jury to

reasonably conclude that Chen understood that they were asking her and Wang to unlawfully import 1-boc-4-AP into the U.S.

        As an initial matter, there was ample evidence that Chen was aware that the 1-boc-4-AP the DEA sources sought to purchase would be imported into the United States.  Gil explained to Chen (and Wang) that he needed the 1-boc-4-AP and the other chemicals he was purchasing in order to manufacture fentanyl in the United States.  Gil said that he had decided to set up a lab in the United States to manufacture fentanyl, because fentanyl he had manufactured in Mexico had been seized at the U.S. border.  For example, during the Bangkok meeting, Gil said to Chen in English, "let's say, for example, Mexico – I make the product.  Fentanyl, and then I'll take it to the U.S., so in the U.S. sometimes I lose product because of the legality behind it."  (GX 502D-T at 2)  Chen then translated into Mandarin – for Wang – what Gil had said:  "he said he used to produce in Mexico, and then ship it to the United States for sale.  However, when crossing the border, it would be seized . . . [s]o he wants to set up a laboratory in the United States."  (Id. at 2-3; see also GX 502A-T (Gil telling Chen that "my destination [for deliveries of chemicals] right now is New York"); GX 502B-T (Gil telling Chen "I wanna open a lab . . . [i]n New York" to "mak[e] fentanyl"); GX 503A-T (Chen asking Gil:  "How about your New York lab? . . . [I]s [it] under construction?"))

        There was also ample evidence that Chen understood that it was unlawful for her, Wang, and Amarvel Biotech to import into the United States the chemicals Gil was purchasing from Amarvel Biotech.  During the Fiji meeting, for example, Chen asked Gil what would happen if, "in America" "our products [are] blocked by the police."  (GX 505C-T at 3)  Chen also interpreted Wang's remarks in Mandarin – discussed above (see, e.g., GX 502D-T at 4) – in which he bragged about Amarvel Biotech's success in evading customs seizures.  Chen was also

aware that Amarvel Biotech disguised its shipment of chemicals by packaging its chemicals in food packaging.  (See, e.g., GX 711 (image of "Nature's Nuts" packaging found on Chen's laptop)  Chen also read a Voice of America article describing how the U.S. government had sanctioned one of Amarvel Biotech's competitors for supplying "Mexican drug cartels with precursor chemicals for the production of illegal fentanyl intended for the U.S. market," and had charged three of that company's employees with "fentanyl importation and money laundering." (GX 802; GX 253-T at 2; Tr. 1045-47)  Given this evidence, a reasonable juror could have concluded that Chen intended, knew, or had reasonable cause to believe that the 1-boc-4-AP purchased by Gil and Jose would be unlawfully imported into the United States.

Chen's argument that she was "merely acting as a translator," and that no one told her that her conduct constituted "violat[ions] [of] the narcotics laws of the United States," does not excuse her from criminal liability.  (Am. Chen Mot. (Dkt. No. 141) at 11)  As an initial matter, the evidence showed that Chen was not "merely acting as a translator."  In addition to her translation duties at the in-person meetings and video sessions, she played an instrumental role in Amarvel Biotech's advertising of fentanyl and methamphetamine precursors over the internet.  It was Chen who registered the Amarvel Biotech websites that were used to advertise the sale of the precursor chemicals (see GX 301A to 301G (website registration records showing that amarvelbio.com and other affiliated websites were registered to Chen); GX 203-205, 207-209, 211-215, 217-220 (Amarvel Biotech webpages advertising precursor chemicals for sale)), and these websites explicitly advertised the sale of chemicals used "in the preparation of Fentanyl derivatives."  (See GX 208, 212, 215, 218 (stating that the advertised chemical is an "[i]ntermediate in the preparation of Fentanyl derivatives")  And Chen was well aware that the websites she registered and oversaw were being used to sell chemicals that are components of

fentanyl.  (See, e.g., GX 713-721 (promotional material, including photos for 1-boc-4-piperidone found on Chen's laptop); GX 722, 743-744 (same, for 1-boc-4-AP); GX 745 (text file found on Chen's laptop containing a product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives"))   Moreover, there was evidence at trial that Google had sent emails to Chen notifying her that certain Amarvel Biotech advertisements had been taken down because they used the word "fentanyl."  (See GX 810-813) In sum, Chen's conduct went well beyond mere translation.

As to Chen's argument that she was not aware that her conduct violated U.S. law, such knowledge is not an element of the crime.  As discussed above in connection with Defendant Wang, the knowledge element is satisfied here if the evidence shows that Chen knew that (1) "the chemical at issue was 1-boc-4-AP," or (2) "the chemical at issue was controlled or regulated by United States federal drug laws."  (Tr. 1510); see also McFadden, 576 U.S. at 192 ("[I]gnorance of the law is typically no defense to criminal prosecution[.]").  Here – for reasons already discussed – a reasonable juror could have found that Chen knew both that the chemical at issue was 1-boc-4-AP, and that the chemical at issue was controlled or regulated under U.S. law. (See, e.g., GX 402 at 10-11 (discussing invoice for the second shipment that Yang had transmitted to Chen, Wang, Jose, and Gil; invoice contains references to 1-N-Boc-4-(phenylamino)piperidine and the CAS number for 1-boc-4-AP); GX 505C-T at 3 (Chen asking what would happen if, "in America" "our products [are] blocked by the police"); GX 251-T, 252-T, 253-T (Voice of America articles – found in Chen's browsing history – discussing, inter alia, charges brought against three executives of Chinese chemical company that had supplied Mexican drug cartels with precursor chemicals for the production of fentanyl intended for the U.S. market))

Accordingly, Chen's motion for a judgment of acquittal on Count Two will be denied.

### 2.    Rule 29 Motion as to Count Five

Chen argues that the Government failed to prove the object of the conspiracy alleged in Count Five – conspiracy to commit money laundering.  (See Am. Chen Mot. (Dkt. No. 141) at 12-13)

The Court instructed the jury that

> [t]he object of the conspiracy charged in Count Five is to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside of the United States in an amount exceeding $10,000 with the intent to promote the carrying on of [a] specified unlawful activity, here, felony narcotics offenses involving controlled substances and listed chemicals.

(Tr. 1519)  According to Chen, "[t]he Government failed to prove that Ms. Chen had 'the intent to promote the carrying on of a felony narcotics offense.'"  (Am. Chen Mot. (Dkt. No. 141) at 12 (quoting Tr. 1519))  In making this assertion, Chen says that her "[t]he arguments and reasoning are the same" as those she made in connection with Count Two.  (Id. at 12)  In sum, Chen contends that because she was not told that she was dealing with members of a Mexican drug cartel, and was not aware that her conduct violated U.S. laws, her motion for a judgment of acquittal on Count Five must be granted.  (Id.)  As discussed above, these arguments are not persuasive, because the Government was not required to offer such evidence to obtain a conviction.  In connection with the money laundering conspiracy count, it is sufficient that the Government offered evidence that Chen intended "to promote the carrying on of . . . felony narcotics offense involving controlled substances and listed chemicals" – specifically 1-boc-4-AP.

As to Count Five, Chen also argues that "the funds [at issue] were transferred in a traceable medium (crypto), and the client received a payment receipt," which is "inconsistent with a person looking to conceal an illegal narcotics transaction." (Am. Chen Mot. (Dkt. No. 141) at 13) But issues of intent are for the jury and not for this Court. See McCormick v. United States, 500 U.S. 257, 270 (1991) ("It goes without saying that matters of intent are for the jury to consider."); United States v. Chacko, 169 F.3d 140, 149 (2d Cir. 1999) ("whether the requisite intent was established" is "a factual determination, appropriate for resolution by the jury"); see also Mariani, 725 F.2d at 865 ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.") (citation omitted). It is sufficient here that a reasonable jury could have found that Wang, Chen, and Yang used cryptocurrency as the mode of payment because of a desire to conceal what they understood to be an illegal narcotics transaction. Indeed, Yang told Jose that "most of our customers use Bitcoin and Western Union for payment[s] and are always safe" from "payment issues being traced." (GX 401 at 9; Tr. 163-64)

Accordingly, Chen's motion for a judgment of acquittal on Count Five will be denied.

### 3. Rule 33

Chen also moves for a new trial under Rule 33, arguing that "the Government spent much time connecting Ms. Chen to web pages she had not created and did not recognize," and which had "no bearing on Ms. Chen's guilt." (Am. Chen Mot. (Dkt. No. 141) at 13)

At trial, however, Chen's counsel – Marlon Kirton – conceded that the Amarvel Biotech website pages were relevant. (See Tr. 865 (discussion regarding GX 1206, a CD containing Amarvel Biotech website pages: "MR. KIRTON: . . . [I]t's relevant information,

what's on the data is relevant.  THE COURT:  You agree it's relevant?  MR. KIRTON:  Yeah, of course."))

Indeed, the evidence of Chen's involvement with the Amarvel Biotech websites was highly relevant, because this evidence supported an inference that Chen was aware that Amarvel Biotech was selling precursor chemicals such as 1-boc-4-AP that could be used to make fentanyl, and that the company used deceptive packaging to avoid detection by U.S. customs and law enforcement.

Given the evidence that Chen had registered Amarvel Biotech's websites (see GX 301A to 301G), Yang's statement to Jose that "Chiron is responsible for the operation of our company's website" (GX 401 at 57), Google's complaints to Chen about the presence of the word "fentanyl" in Amarvel Biotech's ads (GX 810-813), and the presence of promotional material from Amarvel Biotech website pages on Chen's laptop (GX 745 (text file found on Chen's laptop containing a product listing for 1-boc-4-AP, which describes the chemical as an "[i]ntermediate in the preparation of Fentanyl derivatives")), a reasonable jury could have found that Chen was aware of the content on the Amarvel Biotech websites – including advertisements for 1-boc-4-AP.  Acknowledging Chen's testimony that she did not recognize certain Amarvel Biotech website pages (see Tr. 1136-40), the jury was not required to accept Chen's account.  And when deciding a Rule 33 motion, "a district court must 'defer to the jury's resolution of conflicting evidence[.]'" Archer, 977 F.3d at 188 (quoting McCourty, 562 F.3d at 475-76).

*        *        *        *

In seeking a judgment of acquittal pursuant to Rule 29, or a new trial pursuant to Rule 33, Chen asks this Court to credit her testimony rather than the Government's evidence.  But it is not this Court's role to make credibility findings.  That responsibility belongs to the

jury, and Chen has provided no basis for this Court to overturn the jury's determinations.

Accordingly, Chen's motions will be denied.

## CONCLUSION

For the reasons stated above, the Defendants' Rule 29 and Rule 33 motions (Dkt. Nos. 135-136) are denied.

Dated: New York, New York
        June 24, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge