UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

QINGZHOU WANG,

Defendant.

**MEMORANDUM
OPINION & ORDER**

(S1) 23 Cr. 302 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

At an August 21, 2025 sentencing hearing Defendant Qingzhou Wang raised – for

the first time – a number of objections to the Presentence Report's ("PSR") calculation of his

base offense level.  (See Aug. 21, 2025 Tr. (Dkt. No. 182) at 6-18)[1]  In response to Wang's

objections, the Court adjourned sentencing and directed the parties to submit briefing concerning

the proper calculation of Wang's base offense level.  (Id. at 18-21; Aug. 23, 2025 Order (Dkt. No.

171))  For the reasons stated below, the Court concludes that the U.S. Probation Office properly

calculated Wang's base offense level as 30.  Accordingly, Wang's objections to the PSR's

calculation of his base offense level will be overruled.

## BACKGROUND[2]

On January 29, 2025, a jury convicted Defendant Wang of (1) conspiracy to

manufacture and distribute 1-boc-4-AP, a fentanyl precursor chemical, knowing or having

reasonable cause to believe that it would be imported into the United States and used to

---

[1]  Citations to page numbers of docketed material correspond to the pagination generated by this
District's Electronic Case Files ("ECF") system.  Citations to the trial transcript correspond to
the pagination generated by the court reporter.
[2]  The Court assumes familiarity with the facts of this case, which are set forth in more detail in
this Court's June 24, 2025 Memorandum Opinion & Order denying Defendants' Rule 29 and
Rule 33 motions.  See United States v. Wang, No. (S1) 23 CR. 302 (PGG), 2025 WL 1745285
(S.D.N.Y. June 24, 2025).

manufacture fentanyl (Count Two); (2) manufacturing and distributing 1-boc-4-AP, knowing and having reasonable cause to believe that it would be imported into the United States and used to manufacture fentanyl (Count Three); (3) manufacturing and distributing a listed chemical – methylamine, a methamphetamine precursor chemical – knowing and having reasonable cause to believe that it would be imported into the United States (Count Four); and (4) conspiracy to commit money laundering (Count Five).  (Verdict (Dkt. No. 134))  Wang was acquitted on Count One, which charged him with conspiracy to manufacture and distribute, and possess with intent to manufacture and distribute, fentanyl.  (Id.)

I.    **THE AUGUST 21, 2025 PROCEEDING**

At the scheduled August 21, 2025 sentencing, the Court began by addressing three objections Wang had made in his sentencing submission concerning the factual portions of the PSR.  (See Wang Br. (Dkt. No. 161); Aug. 21, 2025 Tr. (Dkt. No. 182) at 3-6)

Wang objected to Paragraph 15 of the PSR, which references "Wuhan Wingroup Pharmaceutical Co. Ltd." (PSR ¶ 15), arguing that "the government impermissibly relies on co-defendant Chen's testimony, conduct, and ties to Wingroup Pharmaceutical to impute the same connections onto Mr. Wang."  (Wang Br. (Dkt. No. 161) at 17)  The Court overruled this objection because the evidence at trial demonstrated "that Wingroup Pharmaceutical was a sister company to Amarvel Biotech," "Mr. Wang was . . . photographed at a joint Wingroup Pharmaceutical-Amarvel Biotech event," and "he also maintained a WhatsApp username 'wingroup-wang.'" (Aug. 21, 2025 Tr. (Dkt. No. 182) at 3-4)  The Court also noted that Wang's objection "raises a moot point because his guidelines range was not calculated based on any conduct attributable to Wingroup Pharmaceutical, and neither the probation department nor the government contends

that Mr. Wang should be sentenced based on conduct that he engaged in on behalf of Wingroup Pharmaceutical." (Id. at 4)

Wang also objected to Paragraph 16 of the PSR, which states that Amarvel Biotech "targeted precursor chemical customers in Mexico by advertising fentanyl precursors as a 'Mexico hot sale,'" and promoted its ability to guarantee "'100% stealth shipping,'" including to Culiacan, Mexico, which the PSR describes as "the base of the Sinaloa Cartel." (PSR ¶ 16) Wang objected to the reference to the Sinaloa Cartel, stating that not all shipments of goods to Culiacan, Mexico involve the Sinaloa Cartel. (Wang Br. (Dkt. No. 161) at 17) The Court overruled Wang's objection to Paragraph 16 of the PSR because Wang "does not dispute that Culiacan, Mexico is in fact the base of the Sinaloa drug cartel, as alleged in the indictment," and Amarvel Biotech "highlighted its shipments to Culiacan because that city is the well-known base of one of the largest Mexican drug cartels, which is heavily involved in the manufacture and distribution of fentanyl." (Aug. 21, 2025 Tr. (Dkt. No. 182) at 4-5) The Court further noted that while "these facts are extrinsic to the proof offered at trial," that "does not preclude the Court from considering them at sentencing." (Id. at 5 (citing United States v. Fletcher, 134 F.4th 708, 713 (2d Cir. 2015))

Wang also objected to Paragraph 26 of the PSR, which describes how Wang's co-defendant and subordinate Er Yang forwarded to co-defendant Yiyi Chen various electronic "chats" she had engaged in with a DEA confidential source. One of these messages references the Chemical Abstract Service ("CAS")[3] numbers for certain chemicals the Defendants had shipped to the DEA informant in January 2023, as well as the informant's assertion that he had used those chemicals to make methamphetamine and fentanyl that would be tested in New York.

---

[3] CAS numbers are unique identifying numbers for chemical substances. (Trial Tr. 796)

(PSR ¶ 26)  Wang argued that there was no evidence at trial that he ever saw these chats between Yang and the DEA source.  (Wang Br. (Dkt. No. 161) at 18)  The Court overruled Wang's objection to Paragraph 26, however, because "the evidence concerning the chats relates to the activities of other members of the conspiracy of which Mr. Wang was a part," and the Court is "free to consider such information in that context."  (Aug. 21, 2025 Tr. (Dkt. No. 182) at 6)

The Court then asked Wang's counsel if he had any other objections to the factual portions of the PSR.  In response, Wang's counsel raised a series of objections to the PSR's calculation of Wang's base offense level.  (Id.)[4]

The PSR calculates a base offense level of 30 based on the following reasoning:

> The guideline for a violation of 18 U.S.C. §1956(h) is USSG §2S1.1.  Pursuant to §2S1.1(a)(1), the base offense level is the offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense; and (B) the offense level for that offense can be determined.  As Wang committed the underlying offense of conspiracy to import precursor chemicals and that offense level can be determined, §2D1.11 shall apply.  Pursuant to §2D1.11(e)(1) and Application Note (A), the base offense level is 30 because the offense involved 600 grams of methylamine and 30 kilograms or more of 1-boc-4-AP (analogized to piperidine).

(PSR ¶ 50)

At the August 21, 2025 sentencing proceeding, Wang raised three issues regarding the PSR's base offense level calculations.  First, Wang argued that because the methylamine that was shipped to the DEA source in January 2023 was at "30 percent purity," the "actual weight" of the methylamine – for purposes of calculating the base offense level – "should be 268 grams,"

---

[4] Although the Court asked Wang's counsel about objections to the factual portions of the PSR, counsel responded with objections to the PSR's calculation of Wang's Guidelines range.

rather than the 894 grams cited in the PSR.  (See Aug. 21, 2025 Tr. (Dkt. No. 182) at 6-7; PSR ¶¶ 43, 50)[5]

Wang also objected to the PSR analogizing 1-boc-4-AP and ortho-methyl-1-boc-4-AP – which are not listed in U.S.S.G. § 2D1.11(e) (the Sentencing Guidelines chemical quantity table for listed chemicals) – to piperidine (which is listed in the Guidelines chemical quantity table).  (See Aug. 21, 2025 Tr. (Dkt. No. 182) at 9-13)

Finally, Wang argued that this Court should not consider – for sentencing purposes – the 750 kilograms of 1-boc-4-AP that the Defendants agreed to sell to a DEA confidential source at a June 8, 2023 meeting in Fiji.  (Id. at 13)

As discussed above, because Wang's objections to the calculation of his base offense level were raised for the first time at the August 21, 2025 proceeding, this Court adjourned Wang's sentencing and directed the parties to brief the following issues:

(1)    whether the purity of methylamine is relevant in determining Wang's base offense level pursuant to U.S.S.G. § 2D1.11;

(2)    whether the Probation Office properly analogized 1-boc-4-AP to piperidine in determining the base offense level pursuant to U.S.S.G. § 2D1.11;

(3)    whether the chemicals that Defendant Wang agreed to sell to the DEA confidential source at the Fiji meeting should be considered in calculating his base offense level; and

(4)    whether the Probation Office's calculation of Wang's base offense level as 30 is otherwise improperly calculated.

(Id. at 18-20; Aug. 23, 2025 Order (Dkt. No. 171))

---

[5] Although the PSR acknowledges that the January 2023 shipment from Defendants contained 894 grams of methylamine, in calculating Wang's base offense level, the PSR refers to "600 grams of methylamine."  (PSR ¶ 50)  This is because U.S.S.G. § 2D1.11(e) – the chemical quantity table for listed chemicals including methylamine – does not assign base offense levels for quantities of methylamine greater than 600 grams.  Id. at § 2D1.11(e)(1).  Accordingly, any quantity of methylamine greater than 600 grams has no effect on the calculation of Wang's base offense level.

Wang submitted his supplemental brief on August 28, 2025 (see Wang. Supp. Sent. Br. (Dkt. No. 174)), and the Government filed its response on September 3, 2025 (see Govt. Supp. Sent. Br. (Dkt. No. 179)).

## DISCUSSION

### I.    PURITY OF METHYLAMINE

As discussed above, Wang contends that the purity of the methylamine he shipped to the United States should be considered in determining its total weight. According to Wang, because the methylamine he shipped was only 30% pure, its total weight of 894 grams should be reduced to 268 grams for Guidelines purposes. (Wang. Supp. Sent. Br. (Dkt. No. 174) at 4)[6]

The evidence concerning the January 2023 shipment of methylamine can be summarized as follows: On December 5, 2022, in a WhatsApp chat with Yang, the DEA confidential source "Jose" ordered one kilogram of 1-boc-4-AP, one kilogram of 1-boc-4-piperidine, and one kilogram of methylamine. (GX 401 at 11) On January 18, 2023, DEA agents retrieved a package sent by the Defendants to Jose. (GX 1004) The package contained three individually sealed bags. (GX 102-104 (photographs of the package and the three bags inside)) In one of those bags was a plastic bottle that contained a liquid that DEA forensic chemist Matthew Sider tested. (See GX 3 (the physical bottle); Trial Tr. 324-26 (Sider describing GX 3 and how he tested it)) Based on those tests, Sider determined that the liquid in the bottle "contained methylamine." (Trial Tr. 327) Sider calculated the "net weight"[7] of the liquid as 893.6 grams. (Id.) Sider did not determine the purity of the methylamine. (Id. at 328-29) The

---

[6] While 894 grams of methylamine correlates with a base offense level of 30, 268 grams of methylamine correlates with a base offense level of 28. See U.S.S.G. § 2D1.11(e)(2).
[7] The "net weight" is "the weight of the . . . liquid without any packaging." (Trial Tr. 315)

PSR calculates Wang's base offense level as 30 because, <u>inter</u> <u>alia</u>, his offenses involve 600 grams or more of methylamine. (PSR ¶ 50 (citing U.S.S.G. § 2D1.11(e)(1)))

According to Wang, however, "the January 2023 bottle was not 100% pure [m]ethylamine." (Wang Supp. Sent. Br. (Dkt. No. 174) at 4) In this regard, he points to a photograph of the bottle containing the methylamine that was shipped to the United States. A label on the bottle contains what appears to be Mandarin characters, a notation of "30%," and the CAS number for methylamine:



(Wang Supp. Sent. Br., Ex. A (Dkt. No. 174-1) at 8)

Although there is no evidence as to the meaning of the Mandarin characters next to "30%," Wang argues that they convey that the methylamine in the bottle is 30% pure. (Wang Supp. Sent. Br. (Dkt. No. 174) at 4) Wang also contends that "100% pure methylamine is a gas [and] not a liquid," and therefore the liquid shipped in January 2023 could not have been pure methylamine. (Id. (citing Methylamine, Chemical Book, https://perma.cc/U5V6-P87H)) In sum, Wang argues that the actual weight of the methylamine shipped in January 2023 is 286.08 grams – 30% of 894 grams. (Id. at 5, 8)

The Court concludes that there is no reliable evidence as to the purity of the methylamine that the Defendants shipped to the DEA source in January 2023. The DEA did not determine the purity of the methylamine in the bottle (Trial Tr. 328-29), and there is no evidence either as to the meaning of the "30%" notation on the bottle or the meaning of the Mandarin characters next to the 30% figure. Accordingly, any argument that the methylamine in the bottle was 30% pure is premised on mere speculation. In any event, the purity of the methylamine is irrelevant for purposes of the Sentencing Guidelines.

In arguing that only the weight of the pure methylamine should be considered in calculating the base offense level, Wang cites to a number of DEA regulations concerning registration, reporting, and record-keeping requirements for the lawful manufacturing, importation, distribution, and export of List I chemicals.[8] (Wang Supp. Sent. Br. (Dkt. No. 174) at 3-4) Some of these administrative requirements are linked to the weight of the relevant

---

[8] List I chemicals, including methylamine, are substances that are designated by the Administrator of the DEA as controlled substances. See C.F.R. § 1310.02(a)(14) (designating methylamine as a List I chemical); 21 U.S.C. § 959(a) (making unlawful the "manufacture or distribut[ion] [of] . . . a listed chemical intending, knowing, or having reasonable cause to believe that such . . . chemical will be unlawfully imported into the United States").

chemical, rather than the combined weight of the chemical and the solvent it is mixed with.  See 21 C.F.R. § 1310.04(f)(1)(i) (setting record-keeping requirements based on chemical weight).  For example, one such regulation concerning DEA registration, reporting, and record-keeping requirements provides – as to methylamine – that the weight threshold for determining the applicability of an exemption from these requirements will be "based on methylamine in the mixture and not the combined weight of carrier solvent, if any."  21 C.F.R. § 1310.12(c).  Wang also contends that methylamine is exempt from registration, reporting, and record-keeping requirements if its purity is below 20%.  (Wang Supp. Sent. Br. (Dkt. No. 174) at 4 (citing 21 C.F.R. § 1310.12(c))

The regulatory structure that Wang relies on applies to the lawful manufacturing, importation, distribution, and export of List I chemicals, however, and has no application to Wang's criminal conduct.  Indeed, the DEA regulation that Wang cites – 21 C.F.R. § 1310.12 – states that "[n]o exemption granted pursuant to . . . § 1310.12 . . . affects the criminal liability for illegal possession, distribution, exportation, or importation of listed chemicals contained in the exempt chemical mixture."  Id. § 1310.12(b); see also United States v. Ching Tang Lo, 447 F.3d 1212, 1224 (9th Cir. 2006) (noting that "record keeping and reporting regulations" and exemptions thereto found in 21 C.F.R. § 1310.12(c) do "not affect 'the criminal liability for illegal possession, distribution, exportation, or importation of listed chemicals contained in the exempt chemical mixture'") (emphasis in original) (quoting 21 C.F.R. § 1310.12(b)).  Nor are the DEA regulations that Wang cites referenced in the criminal statutes that he violated or the Sentencing Guidelines provisions that apply to his sentencing.

As to the Sentencing Guidelines – while they do not take the purity of methylamine into account when calculating a defendant's base offense level under the chemical

quantity table in U.S.S.G. § 2D1.11(e) – as to certain other chemicals purity is explicitly addressed. For example, Note C to § 2D1.11(e) provides that when calculating the base offense level for "ephedrine, pseudoephedrine, or phenylpropanolamine tablets," courts must "use the weight of the ephedrine, pseudoephedrine, or phenylpropanolamine contained in the tablets, not the weight of the entire tablets." This differentiation between substances demonstrates that purity is not relevant for purposes of methylamine.

It was for such reasons that the Fourth Circuit rejected the argument Wang makes here:

> King also claims that the district court erred in calculating his base offense level based upon the full weight of methylamine found in his home (362.5 grams). King contends that, because methylamine is found in a solution containing 60 percent water, he should be held accountable for only 165 grams, or 40% of the solution found in his home. King's claim is without merit. The sentencing guidelines pertaining to listed chemicals do not differentiate between "actual" and "non-actual" quantities. Compare USSG § 2D1.1, note B (specifically indicating that for PCP and methamphetamine, courts should consider the purity of the controlled substance when determining the actual amount held) with USSG § 2D1.11 (making no differentiation for purity).

United States v. King, 110 F.3d 61, at *2 (4th Cir. 1997) (per curiam) (footnote omitted) (unpublished).

In sum, the purity of the methylamine that Wang and his co-conspirators shipped to the United States is irrelevant to the calculation of his base offense level under the Sentencing Guidelines. Because Wang's offenses involved more than 600 grams of methylamine, his base offense level is 30. U.S.S.G. § 2D1.11(e).[9]

---

[9] Wang also appears to argue that the January 2023 shipment should not be considered in determining Wang's base offense level, because that shipment is not within the scope of "relevant conduct" used to calculate the applicable Guidelines range. (See Aug. 21, 2025 Tr. (Dkt. No. 182) at 7 ("As to all of the methylamine in this shipment that occurred in January, our position is that it was not reasonably foreseeable because of the Second Circuit's position in [United States v.] Khandrius, [613 F. App'x 4 (2d Cir. 2015)] where, for sentencing purposes, the

scope of the conspiracy is much narrower as to what the relevant conduct that may be considered for Mr. Wang may be, notwithstanding the guilt and liability of a conspiracy at trial.")) Although Wang has never briefed relevant conduct issues associated with the January 2023 shipment, the Court addresses below how the Guidelines' relevant conduct provisions apply to that shipment.

Under the Sentencing Guidelines, "[r]elevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[.]" For purposes of a conspiracy, relevant conduct includes "all acts and omissions of others" that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. §§ 1B1.3(a)(1)(A)-(B).

Here, the January 2023 shipment is "relevant conduct" for purposes of calculating Wang's base offense level under the Guidelines. As an initial matter, Wang was convicted on Counts Three and Four, which charged him – respectively – with manufacturing and distributing 1-boc-4-AP and manufacturing and distributing methylamine, intending, knowing, or having reasonable cause to believe that those chemicals would be imported into the United States. (Verdict (Dkt. No. 134) at 4) The January 2023 shipment was the only shipment in this case that contained (1) methylamine; and (2) 1-boc-4-AP. Accordingly, in convicting Wang on Counts Three and Four, the jury necessarily determined that Wang himself manufactured or distributed methylamine and 1-boc-4-AP in connection with the January 2023 shipment, intending, knowing or having reasonable cause to believe that those chemicals would be imported into the United States. And the jury's determination in this regard was supported by compelling evidence demonstrating that Wang was the "boss" who approved the January 2023 shipment. (See, e.g., GX 401 at 15-16 (after the DEA source Jose placed the order for the January 2023 shipment, Yang told Jose that she would "confirm with [her] boss and apply for [the] shipment"; after receiving payment, stating that her "boss said that the money has been received"); id. at 42 (Yang identifying her boss as "Mr. Wang")); see also Wang, 2025 WL 1745285, at *3, *13-15. In sum, the January 2023 shipment is relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A) for purposes of Wang because he directly committed offenses that are premised on the January 2023 shipment.

The January 2023 shipment is also relevant conduct under U.S.S.G. § 1.3(a)(1)(B), because – for purposes of the 1-boc-4-AP conspiracy charged in Count Two – the January 2023 shipment was within the scope of the criminal activity that Wang agreed to; it was in furtherance of that criminal activity, and the January 2023 shipment was reasonably foreseeable to Wang given that he approved the order and confirmed payment for the order.

In sum, the January 2023 shipment is relevant conduct under the Sentencing Guidelines, and the Court will consider the 864 grams of methylamine and the kilogram of 1-boc-4-AP that were part of the January 2023 shipment in calculating Wang's base offense level.

## II.    1-BOC-4-AP ANALOGIZED TO PIPERIDINE[10]

Wang argues that – in calculating his base offense level – the PSR improperly

analogizes 1-boc-4-AP to piperidine.  (Wang Supp. Sent. Br. (Dkt. No. 174) at 5-6)

1-boc-4-AP is not referenced in the Guidelines chemical quantity chart, U.S.S.G.

§ 2D.11.  U.S.S.G. § 2X5.1 provides that, in such circumstances, courts must refer to the "most

analogous offense guideline":

> If the offense is a felony for which no guideline expressly has been promulgated,
> apply the most analogous offense guideline.  If there is not a sufficiently
> analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that
> any guidelines and policy statements that can be applied meaningfully in the
> absence of a Chapter Two offense guideline shall remain applicable.

U.S.S.G. § 2X5.1; see also United States v. Rahman, 189 F.3d 88, 150 (2d Cir. 1999) (Section

2X5.1 "obliges the sentencing judge to apply the most analogous guideline," which "involves the

application of a guideline to the facts, a determination to which [the Second Circuit] will give

'due deference'") (quoting 18 U.S.C. § 3742(e)); United States v. Miller, 73 F. App'x 338, 341

(10th Cir. 2003) (finding that the "most analogous offense guideline" for iodine – which was not

listed in § 2D1.11 in the then applicable version of the Guidelines – was either the guideline for

hydriodic acid (which is produced using iodine), or the guideline for methamphetamine (which

can be produced using, inter alia, hydriodic acid)).

Here, the evidence at trial showed that the structure of fentanyl contains a

piperidine ring (Trial Tr. 805); that 1-boc-4-AP has a piperidine ring (id. at 805-06); and that 1-

boc-4-AP contributes its piperidine ring when used to synthesize fentanyl (id. at 813).  Given

---

[10]  Because Wang's base offense level is 30 based on merely the quantity of methylamine
involved in his offenses, his remaining arguments about base offense level are moot.  The Court
nonetheless addresses his arguments regarding 1-boc-4-AP and the quantities of controlled
substances discussed at the Fiji meeting, because these matters provide an alternative basis for
calculating a base offense level of 30.

these circumstances, this Court concludes that the most analogous guideline for 1-boc-4-AP is the guideline for piperidine in § 2D1.11.

Wang also complains that – in calculating his base offense level – the PSR "relied upon the May 2023 shipment of 50 kg of tert-Butyl 4-((2-methylphenyl) amino) piperidine-1-carboxylate, also known as ortho-[methyl]-N-boc-4-AP." (Wang Supp. Sent. Br. (Dkt. No. 174) at 5)  Ortho-methyl-N-boc-4-AP was the substance Defendants actually shipped to a DEA source in May 2023, although Defendants had agreed to provide 1-boc-4-AP. (Trial Tr. 771 (DEA forensic chemist Fracia Martinez testifying that one of the chemicals shipped in May 2023 was ortho-methyl-N-boc-4-AP); GX 402 at 10 (invoice for the May 2023 shipment, indicating that Defendants had agreed to ship 1-boc-4-AP))

In any event, Wang notes that ortho-methyl-N-boc-4-AP "is not a DEA Listed Chemical," and he argues that "it is inappropriate to analogize an entirely unlisted chemical to a List I regulated chemical, such as piperidine." (Wang Supp. Sent. Br. (Dkt. No. 174) at 5)

The PSR does not rely on Wang's shipment of 50 kilograms of ortho-methyl-N-boc-4-AP in determining Wang's offense level, however.  Instead – as to the May 2023 shipment – the PSR holds Wang liable for his agreement to provide 50 kilograms of 1-boc-4-AP (even though he ultimately provided 50 kilograms of ortho-methyl-N-boc-4-AP instead):

> WANG is responsible for distributing more than [. . .] 30 kilograms of 1-boc-4-AP, which represents the precursor chemicals that were distributed by WANG and others.  This includes the January 2023 shipment (actual chemical weight of 1 kilogram of 1-boc-4-AP [. . .]), the May 2023 shipment (intended chemical weight of 50 kilograms of 1-boc-4-AP, based upon the April 2023 invoice and corresponding discussions for an order of 50 kilograms of 1-boc-4-AP [. . .]), and the June 2023 meeting in Fiji (intended 750 kilograms of 1-boc-4-AP based on WANG and others['] agreement to sell 15 times the prior shipment amount of 1-boc-4-AP during a May 9, 2023, video call).

(PSR ¶ 43)  The PSR explains that the weight of the chemicals it attributes to Wang in connection with the May 2023 shipment "is based on an intended drug amount instead of an

13

actual drug amount because Wang and others agreed to deliver 1-boc-4-AP but actually shipped ortho-methyl-N-boc-4-AP." (PSR ¶ 43 n.1)

The Court agrees with the Probation Officer's approach, and concludes that the PSR properly considers Wang, Chen, and Yang's agreement to sell the DEA source 50 kilograms of 1-boc-4-AP in connection with the May 2023 shipment. As discussed in the PSR (see PSR ¶¶ 30-34) and in this Court's June 24, 2025 Memorandum Opinion & Order, see Wang, 2025 WL 1745285, at *5-6, there is overwhelming evidence that Wang, Chen, and Yang agreed to sell the DEA source 50 kilograms of 1-boc-4-AP in April 2023. For example, on April 11, 2023, the DEA source placed an order in the "Mexico project" group chat (that Wang was a member of) for (1) 50 kilograms of 1-boc-4-AP; (2) 100 kilograms of propionyl chloride; and (3) 60 kilograms of 2-(bromoethyl)benzene. (GX 402 at 8; Trial Tr. 234-35, 567-68) These three chemicals are used to synthesize fentanyl. (Trial Tr. 811-12) The following day, Yang transmitted over the group chat an invoice on Amarvel Biotech letterhead listing – by name, CAS number, and quantity – each chemical that the DEA source had ordered, including 1-boc-4-AP:[11]

---

[11] The CAS number for 1-boc-4-AP is 125541-22-2. (Trial Tr. 808) 1-N-boc-4(phenylamino)piperidine is another name for 1-boc-4-AP. (Id.)

(GX 402 at 10)  Yang later confirmed to the DEA source that Amarvel Biotech had received the payment for the order (id. at 12), and the cryptocurrency wallet that received the money was registered to Wang.  (GX 304-T; Trial Tr. 242-43)

Based on the unlawful conspiratorial agreement formed in April 2023, this Court concludes that the conspiracy charged in Count Two – on which Wang was convicted – involved at least 50 kilograms of 1-boc-4-AP.  Accordingly, the April 2023 agreement regarding 50 kilograms of 1-boc-4-AP provides an independent and sufficient basis for the PSR's determination that Wang's base offense level is 30.  See U.S.S.G. § 2D1.11(e)(1).

## III.    WANG AND CHEN'S AGREEMENT TO SELL CHEMICALS AT THE FIJI MEETING

Wang also argues that the Court should not consider the weight of the chemicals that Wang and Chen agreed to sell to the DEA source at the June 8, 2023 Fiji meeting.  (See Wang Supp. Sent. Br. (Dkt. No. 174) at 6-8)

The background to the June 8, 2023 Fiji meeting can be summarized as follows: In April 2023, Wang, Chen, and Yang agreed to sell a DEA source three chemicals, including 50 kilograms of 1-boc-4-AP.  (See GX 402 at 8-10)  As discussed above, however, in May 2023 Defendants shipped 50 kilograms of ortho-methyl-N-boc-4-AP to the DEA source rather than the 50 kilograms of 1-boc-4-AP that they had promised and invoiced for.  (Trial Tr. 771, 776-78, 819) After the May 2023 shipment, the Defendants and the DEA confidential source began planning another, much larger sale of fentanyl precursor chemicals.  In advance of and at the June 8, 2023 Fiji meeting, Wang and Chen agreed to provide to the DEA source fifteen times the quantity of the same chemicals ordered in April 2023.  (See GX 504A-T at 2-3; 505D-T at 2; Trial Tr. 607)

According to Wang – because what was actually shipped to the DEA source in May 2023 was ortho-methyl-N-boc-4-AP and not 1-boc-4-AP – any subsequent agreement by the conspirators to sell the DEA source "15 times" what he previously ordered was in fact a reference to ortho-methyl-N-boc-4-AP, which is not a List I chemical.  (Wang Supp. Sent. Br. (Dkt. No. 174) at 7)  In support of this argument, Wang asserts that "[n]either the PSR, nor the government's sentencing memorandum allege[s] that the [DEA source] identified the specific chemicals he wanted at the higher quantity [during the Fiji meeting]."  (Id. at 6)

This Court finds by a preponderance of the evidence, however, that Wang and Chen agreed to sell the DEA source 750 kilograms of 1-boc-4-AP – fifteen times the quantity that had been ordered in April 2023.

As an initial matter, it is clear that 1-boc-4-AP is what the DEA source ordered in April 2023, even if that is not what the Defendants delivered in May 2023.  (See, e.g., GX 402 at 10 (invoice listing the CAS number for 1-boc-4-AP))  As noted above, after that purchase, the Defendants and the DEA source planned a much larger sale of fentanyl precursor chemicals.

Wang, Chen, and two DEA sources discussed that much larger purchase during a May 9, 2023 video call.  During that call, Chen asked one of the DEA sources whether he wanted to order the "three same [chemicals] as those three you ordered last time?"  (GX 504A-T at 2)  The DEA source responded:  "Yes.  Everything the same," stating that he wanted "fifteen times on each product" to "make up to three tons."  (Id. at 2-3)  After further calculations and discussions with Wang about the precise chemicals and quantities that the DEA source wanted to order (see id. at 4-6), Chen wrote down on a piece of paper the partial CAS numbers and quantities for 1-boc-4-AP, propionyl chloride, and 2-(bromoethyl)benzene – the same three chemicals that the DEA confidential source ordered in April 2023.  The quantity Chen listed for 1-boc-4-AP – partial CAS number 125541 – is 750 kilograms.  A screenshot from the video recording of the May 9, 2023 call is below:



(See GX 504A at 6:47)[12]  During the same video call, Wang requested that the DEA source "pay

a deposit" before the parties met in Fiji to finalize the sale.  (GX 504A-T at 6-7)  Yang

subsequently negotiated with the DEA source about the necessary deposit.  (GX 401 at 75)  The

DEA source ultimately agreed to provide a deposit of $20,000 in USDT.[13]  (Trial Tr. 258)  Yang

confirmed receipt of the funds on May 16, 2023.  (GX 402 at 27-28)

During the June 8, 2023 Fiji meeting, Wang, Chen, and the DEA source discussed

the planned multi-ton purchase of fentanyl precursor chemicals, and agreed on a price of $1.5

---

[12]  GX 504A has been redacted to protect the identities of the two DEA confidential sources
shown in this exhibit.  (See Dkt. No. 180)  The red square has been added for emphasis.
[13]  USDT is a cryptocurrency that has a value that is pegged to the U.S. dollar.  (Trial Tr. 166)

million. (Trial Tr. 607)  At that meeting, Chen again referenced the CAS number for 1-boc-4-AP

– 125541-22-2 (id. at 808-09):

> CHEN:        So, you mean, uh, you want to buy 3 tons 1 at one time?  And, uh,
>              these three, uh, 750?
>
> GIL:         Yeah.
>
> CHEN:        And, uh, Mr. Wang asking that, uh, because one time we produce
>              for this product 125541, uh one time we produce the quantity will
>              be 1 ton.
>
> GIL:         [SC] Okay, so I want 3 tons in total, so just make the division, you
>              know how the final product is going to be, okay?

(GX 505D-T at 2)[14]  As noted earlier, "125541" is the first six digits of the CAS number for 1-

boc-4-AP.  Given this evidence, the Court finds that Wang and Chen agreed to sell the DEA

confidential source 1-boc-4-AP – not ortho-methyl-N-boc-4-AP.

       Wang's arguments to the contrary are not persuasive.  He first argues that because

"no 1-boc-4-AP was ever shipped after January 2023," the Court should not consider the 750

kilograms of 1-boc-4-AP that Wang agreed to provide at the Fiji meeting.  (Wang Supp. Sent. Br.

(Dkt. No. 174) at 7)  However, as to Count Two, Wang was convicted of a conspiracy – a crime

that turns on whether there was an unlawful agreement to manufacture or distribute 1-boc-4-AP

knowing or having reasonable cause to believe that it would be imported into the United States

and used to manufacture fentanyl.  See United States v. Trapilo, 130 F.3d 547, 552 n.9 (2d Cir.

1997) ("'[T]he crime of conspiracy is complete upon the agreement to violate the law, as

implemented by one or more overt acts . . . , and is not at all dependent upon the ultimate success

or failure of the planned scheme.'") (alterations and omissions in original) (quoting United States

v. Everett, 692 F.2d 596, 600 (9th Cir. 1982)).

---

[14]  The transcript notation "[SC]" indicates the presence of simultaneous or overlapping
conversation during the audio recording.  (Id. at 1)

Wang also contends that because he "cannot form a conspiracy with a confidential source alone," "the Court cannot rely on the June 2023 Fiji meeting to establish the offense level weight under U.S.S.G. § 2D1.11." (Wang Supp. Sent. Br. (Dkt. No. 174) at 8)  But the evidence shows that Wang conspired with others at Amarvel Biotech – including Chen and Yang – in connection with the planned purchase and shipment of 750 kilograms of 1-boc-4-AP.  For example, Wang, Chen, and Wang's business partner "Mr. Xia"[15] were all present for the May 9, 2023 video call discussed above, during which the DEA sources and the Defendants discussed the precise chemicals (including by reference to CAS numbers) and the quantity of those chemicals that the confidential sources wished to purchase.  (See GX 504A-T)  Wang, Chen, and Yang were also members of the "Mexico project" group chat (see GX 402) and were participants in the chat during which a DEA source confirmed that he had paid the requested $20,000 deposit necessary to schedule the Fiji meeting.  (Id. at 28)  Yang confirmed in that same group chat that "Mr. Wang has received the money."  (Id.)  Finally, both Wang and Chen were present for the Fiji meeting, at which the details of the planned $1.5 million purchase and shipment of, inter alia, 750 kilograms of 1-boc-4-AP were finalized.  (See GX 505D-T; Trial Tr. 607)

In sum, there was compelling evidence at trial that – in advance of and during the June 8, 2023 Fiji meeting – Wang, Chen, and their co-conspirators conspired to manufacture or distribute 750 kilograms of 1-boc-4-AP, knowing or having reasonable cause to believe that it would be imported into the United States and used to manufacture fentanyl.  750 kilograms of 1-

---

[15]  According to Wang, Xia is another "boss" at Amarvel Biotech, but he is "not in charge of this area anymore" – i.e., no longer in charge of the Company's chemical precursor business.  (GX 502I-T at 2-3)

boc-4-AP, analogized to piperidine, corresponds to a base offense level of 30.  U.S.S.G. § 2D1.11(e)(1).[16]

## CONCLUSION

For the reasons stated above, Wang's objections to the PSR's calculation of his base offense level as 30 are overruled.  The base offense level determination is premised on three independent findings:  that (1) Wang's offenses involved more than 600 grams of methylamine; (2) Wang conspired with others to sell a DEA confidential source 50 kilograms of 1-boc-4-AP in April and May 2023; and (3) Wang conspired with others to sell a DEA confidential source 750 kilograms of 1-boc-4-AP in May and June 2023.[17]

Dated:  New York, New York
        September 17 , 2025

SO ORDERED.

_Paul A Gardephe_
Paul G. Gardephe
United States District Jupdge

---

[16]  Wang also argues that it would be improper for the court to consider the weight of the ortho-metyhl-N-boc-4-AP involved in this case because it would require two levels of analogy:  "from ortho-[methyl]-N-boc-4-AP, an unlisted and unregulated chemical; to 1-boc-4-AP, a List I Chemical, not listed in the Sentencing Guidelines; to Piperidine, a chemical listed in U.S.S.G. § 2D1.11(e)."  (Wang Supp. Sent. Br. (Dkt. No. 174) at 7 (internal citation omitted))  The Court has not considered the ortho-methyl-N-boc-4-AP in calculating Wang's base offense level, however.

[17]  The Court will address Wang's objections to the PSR's two-level mass-marketing enhancement, the two-level enhancement for sophisticated money laundering, and the four-level role-in-the-offense adjustment at the September 18, 2025 sentencing proceeding.